**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RICHARD E. FISCHBEIN, MD, individually and on behalf of a class of similarly-situated persons,<br><br>                         Plaintiff,<br><br>v.<br><br>IQVIA INC.,<br><br>                         Defendant. | Case No. 2:19-cv-05365-NIQA<br><br>**IQVIA INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................. 2

    A.  The Faxes Invited HCPs to Participate in IQVIA Research Studies. .................. 3

    B.  IQVIA Had a Policy to Obtain Consent from Each HCP Prior to Attempting to Send the NDTI and CD Faxes. ..................................................... 5

    C.  NDTI and CD Recruiters Documented Consent From HCPs to Receive Faxes in IQVIA's Systems ................................................................................. 6

        1.  IQVIA Used DSS To Record Consent Until Late-2017 to Early-2018 ............................................................................................................ 7

        2.  IQVIA Transitioned From DSS to Mebos By 2018. ............................... 7

        3.  Recruiters Also Documented Consent in Productivity Trackers. .............. 9

        4.  IQVIA Provided Recruiters with Recommended Terminology for Call Notes, But Recruiters Recorded Consent in Various Ways. ............. 9

    D.  Even Howard's Flawed Automated Analyses Revealed Indicia of Consent for the Vast Majority of HCPs. ............................................................ 11

    E.  Plaintiff's Counsel Then Purported to Manually Review Thousands of Individualized IQVIA Records. ......................................................................... 14

    F.  There Are No Records that Identify Whether Putative Class Members Used an Online Fax Service During the Relevant Time Period. ........................ 16

    G.  The Record Does Not Show What Type of Faxing Equipment the Named Plaintiff Used. ..................................................................................... 17

III. LEGAL STANDARD ...................................................................................... 17

IV. ARGUMENT .................................................................................................... 18

    A.  Plaintiff Fails to Satisfy Commonality or Predominance. ................................. 18

        1.  Individualized Inquiries Predominate Regarding Whether Each Putative Class Member Consented to Receiving a Fax. ......................... 19

            a.  In Performing a Manual Review, Plaintiff Concedes that Individualized Inquiries Are Necessary to Determine Consent. ................................................................................. 19

        2.  Individualized Inquiries Predominate Regarding Whether Each Putative Class Member Received a Fax on a Telephone Facsimile Machine ................................................................................................... 20

            a.  Under the Plain Language of the TCPA, Online Fax Services Do Not Qualify as "Telephone Facsimile Machines." ................................................................................. 20

# TABLE OF CONTENTS
(continued)

Page

b. The TCPA's Legislative History Shows That Faxes Sent to Online Fax Services Do Not Implicate the Harms the TCPA was Designed to Address. ................................................... 22

c. Multiple Circuit Courts and the FCC Have Confirmed that Online Fax Services Fall Outside the Scope of the TCPA. ......... 23

d. Online Fax Services Are Technologically Distinct from Traditional "Telephone Facsimile Machines" Under the TCPA. ................................................................................. 26

e. No Classwide Evidence Exists to Determine Whether Each Putative Class Member Used an Online Fax Service. ................. 28

B. Plaintiff's Proposed Class Is Not Ascertainable. ................................................ 29

1. Plaintiff Cannot Ascertain Which Putative Class Members Consented to Receiving IQVIA's Faxes. .................................................. 29

a. Plaintiff's Class Is Not Defined With Objective Criteria. ........... 29

b. There Is No Reliable and Administratively Feasible Mechanism for Determining the Members of Plaintiff's Proposed Class. ............................................................................ 31

(i) Howard's Threshold Automated Analyses Are Flawed. ............................................................................ 31

(ii) Plaintiff's Counsel's Manual Review Is Incomplete. ...... 32

(iii) Plaintiff's Counsel Misrepresents the Parameters of Their Manual Review. .................................................... 37

2. Plaintiff Cannot Ascertain Which Putative Class Members Received a Fax on a Telephone Facsimile Machine. .............................. 40

3. Plaintiff Impermissibly Proposes a Failsafe Class. ................................. 40

C. Plaintiff Is Not an Adequate or Typical Class Representative. .......................... 42

D. Plaintiff's Counsel Are Not Adequate Class Counsel. ....................................... 43

E. Plaintiff Fails to Establish Superiority. ............................................................... 45

V. CONCLUSION ................................................................................................. 46

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen ex rel. Martin v. LaSalle Bank, N.A.*,
629 F.3d 364 (3d Cir. 2011).................................................................................20

*AT&T v. FCC*,
454 F.3d 329 (D.C. Cir. 2006) ....................................................................26 n.12

*Barclift v. Keystone Credit Servs., LLC*,
585 F. Supp. 3d 748 (E.D. Pa. 2022) ....................................................................43

*Beck v. Maximus, Inc.*,
457 F.3d 291 (3d Cir. 2006) .................................................................................42

*Butela v. Midland Credit Mgmt. Inc.*,
341 F.R.D. 581 (W.D. Pa. 2022) ..........................................................................41

*Byrd v. Aaron's Inc.*,
784 F.3d 154 (3d Cir.), *as amended* (Apr. 28, 2015)...........................17, 29, 31, 40

*Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*,
91 F.4th 202 (4th Cir. 2024) ....................................................................22, 23, 28

*Carta ex rel. Est. of Carta v. Lumbermens Mut. Cas. Co.*,
419 F. Supp. 2d 23 (D. Mass. 2006) .....................................................................43

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)...........................................................................................26 n.11

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985).............................................................................................30

*Cmty. Vocational Schs. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*,
307 F. Supp. 3d 402 (W.D. Pa. 2018) ............................................................22, 42

*Dominguez v. Yahoo!, Inc.*,
No. 13-1887, 2017 WL 390267 (E.D. Pa. Jan. 27, 2017),
*aff'd sub nom. Dominguez on Behalf of Himself v. Yahoo, Inc.*,
894 F.3d 116 (3d Cir. 2018)..............................................................................26 n.11

*Hargrove v. Sleepy's LLC*,
974 F.3d 467 (3d Cir. 2020)..........................................................................18, 44 n.18

*Hawk Valley, Inc. v. Taylor*,
301 F.R.D. 169 (E.D. Pa. 2014)............................................................................46

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)............................................................................17

*Hohider v. United Parcel Serv., Inc.*,
   574 F.3d 169 (3d Cir. 2009).............................................................................18

*Howard v. LVNV Funding, LLC*,
   No. 3:19-cv-93, 2023 WL 2660174 (W.D. Pa. Mar. 22, 2023)............................17

*In re Niaspan Antitrust Litig.*,
   67 F.4th 118 (3d Cir. 2023) ............................................................................18

*Irvin E. Schermer Trust v. Sun Equities Corp.*,
   116 F.R.D. 332 (D. Minn. 1987)...............................................................43, 44

*Jarzyna v. Home Props., L.P.*,
   201 F. Supp. 3d 650 (E.D. Pa. 2016) ...............................................................44

*Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*,
   340 F.R.D. 383 (N.D. Cal. 2021) ............................................................26 n.11, 45

*Lamie v. U.S. Tr.*,
   540 U.S. 526 (2004).......................................................................................20

*Lipstein v. UnitedHealth Grp.*,
   296 F.R.D. 279 (D.N.J. 2013).........................................................................29

*Lyngaas v. IQVIA*,
   No. 2:20-cv0-02370 ................................................................................3 n.2

*Mais v. Gulf Coast Collection Bureau, Inc.*,
   768 F.3d 1110 (11th Cir. 2014) ...............................................................26 n.11

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012).................................................................. *passim*

*Ocasio v. Ciach*,
   804 F. App'x 132 (3d Cir. 2020) ....................................................................30

*Paskel v. Heckler*,
   768 F.2d 540 (3d Cir. 1985)...........................................................................22

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*,
   139 S. Ct. 2051 (2019)..........................................................................26 n.11

*Qwest Servs. Corp. v. FCC*,
   509 F.3d 531 (D.C. Cir. 2007) ...............................................................26 n.11

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3d Cir. 2018)................................................................20

*Riccio v. Sentry Credit, Inc.*,
  954 F.3d 582 (3d Cir. 2020)...........................................................21, 22

*Russello v. United States*,
  464 U.S. 16 (1983)........................................................................21, 22

*St. Louis, I. M. & S. Ry. Co. v. Williams*,
  251 U.S. 63 (1919)..............................................................................45

*Taggart v. GMAC Mortg., LLC*,
  600 F. App'x 859 (3d Cir. 2015) .......................................................30

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)........................................................................43

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  No. 22-15710, 2023 WL 7015279 (9th Cir. Oct. 25, 2023) ................24

*United States v. Williams*,
  917 F.3d 195 (3d Cir. 2019)................................................................27

*Utesch v. Lannett Co.*,
  No. 16-5932, 2021 WL 3560949 (E.D. Pa. Aug. 12, 2021),
  *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co.*,
  No. 21-3150, 2023 WL 2985120 (3d Cir. Apr. 18, 2023) ...................42

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023)................44, 46

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)......................................................................28 n.13

*Webster v. LLR, Inc.*,
  No. 2:17cv225, 2018 WL 10230741 (W.D. Pa. Aug. 20, 2018) ...........18

*Wendell H. Stone Co. v. PC Shield Inc.*,
  No. 18cv1135, 2018 WL 6065408 (W.D. Pa. Nov. 19, 2018) .......................44 n.18

*Zarichny v. Complete Payment Recovery Servs., Inc.*,
  80 F. Supp. 3d 610 (E.D. Pa. 2015) ................................................40, 41

**Statutes and Rules**

47 U.S.C. § 227............................................................................ *passim*

**Other Authorities**

H.R. Rep. No. 102-317 (1991) ................................................................................22

*In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory*
   *Ruling: Rules & Reguls. Implementing the Tel. Consumer Protection Act of*
   *1991 Junk Fax Protection Act of 2005*,
   34 FCC Rcd. 11950 (F.C.C. Dec. 9, 2019) ..................................................24, 25

*In the Matter of Joseph T. Ryerson & Son, Inc. Petition for Declaratory Ruling,*
   *Rules & Reguls. Implementing the Tel. Consumer Protection Act of 1991*,
   35 FCC Rcd. 9474 (F.C.C. Sept. 4, 2020) ..................................................25, 26

*In the Matter of Westfax, Inc. Petition for Consideration & Clarification, Rules &*
   *Reguls. Implementing the Tel. Consumer Protection Act of 1991 Junk Fax*
   *Protection Act of 2005*,
   30 FCC Rcd. 8620 (F.C.C. Aug. 28, 2015) ........................................................25

Minnesota Rule of Professional Conduct 3.7 ...............................................................44

Pennsylvania Rule of Professional Conduct 3.7(a) ......................................................43

**GLOSSARY**

| Abbreviation | Description | Exhibit No.[1] |
|---|---|---|
| Cabrey Tr. | Excerpts of the transcript of the deposition of Cathleen Cabrey, Associate Director, Data Services at IQVIA, taken on April 20, 2023 | 1 |
| Chavez Tr. | Excerpts of the transcript of the deposition of Maria Jelina Chavez, Associate Manager at IQVIA, taken on May 2, 2023 | 2 |
| Coombs Tr. | Excerpts of the transcript of the deposition of Tom Coombs, OpenText's Director of Sales and Rule 30(b)(6) witness for the XMedius Solution Group , taken on July 6, 2023 | 3 |
| De Zuniga Tr. | Excerpts of the transcript of the deposition of Josefina De Zuniga, Manager for Product Operations at IQVIA, taken on May 5, 2023 | 4 |
| Estock Tr. | Excerpts of the transcript of the deposition of Lauren Estock, Plaintiff's office manager, taken on April 6, 2023 | 5 |
| Fischbein Tr. | Excerpts of the transcript of the deposition of Plaintiff Richard E. Fischbein, M.D., taken on March 15, 2023 | 6 |
| Foster Tr. | Excerpts of the transcript of the deposition of Chris Foster, IQVIA's Director of Information Technology and Rule 30(b)(6) witness, taken on April 18, 2023, with select exhibits | 7 |
| Francisco Tr. | Excerpts of the transcript of the deposition of Maribeth Francisco, Team Lead at IQVIA, taken on May 1, 2023 | 8 |
| Howard 1st Dep. | Excerpts of the transcript of the first deposition of Christopher Lee Howard, expert witness for Plaintiff, taken on July 20, 2023 | 9 |
| Howard 2nd Dep. | Excerpts of the transcript of the second deposition of Christopher Lee Howard, expert witness for Plaintiff, taken on February 21, 2024 | 10 |

---

[1] All exhibits are attached to the Declaration of Tiffany Cheung ("Cheung Decl.") in Support of IQVIA Inc.'s (1) Opposition to Plaintiff's Motion for Class Certification; and (2) Motion to Exclude Certain Opinions of Plaintiff's Expert Christopher Lee Howard.

| Abbreviation | Description | Exhibit No.[1] |
|---|---|---|
| Mateo Tr. | Excerpts of the transcript of the deposition of Louie Mateo, Senior Panel Administrator at IQVIA, taken on May 3, 2023 | 11 |
| Bress 1st Rep. | Opening Report of IQVIA's expert witness James Bress, dated July 10, 2023, without exhibits | 12 |
| Bress 2nd Rep. | Rebuttal Report of IQVIA's expert witness James Bress, dated August 8, 2023, without exhibits | 13 |
| Deal 1st Rep. | Opening Report of IQVIA's expert witness Bruce Deal, dated July 10, 2023, without appendices | 14 |
| Deal 2nd Rep. | Rebuttal Report of IQVIA's expert witness Bruce Deal, dated August 8, 2023, without appendices | 15 |
| Deal 3rd Rep. | Sur-Response Report of IQVIA's expert witness Bruce Deal, dated December 22, 2023, without appendices | 16 |
| Howard 1st Rep. | Opening Report of Plaintiff's expert witness Christopher Lee Howard, dated June 7, 2023, without exhibits and with selected appendices | 17 |
| Howard 1st Rep. Ex. A | Exhibit A to the Opening Report of Plaintiff's expert witness Christopher Lee Howard, dated June 7, 2023 | 17A |
| Howard 1st Rep. Ex. B | Exhibit B to the Opening Report of Plaintiff's expert witness Christopher Lee Howard, dated June 7, 2023 | 17B |
| Howard 1st Rep. Revised Code | Revised code document for the Opening Report of Plaintiff's expert witness Christopher Lee Howard, produced by Plaintiff on July 13, 2023 | 18 |
| Howard 1st Rep. Revised Ex. A | Revised Exhibit A to the June 7, 2023 Opening Report of Plaintiff's expert witness Christopher Lee Howard, produced by Plaintiff on July 18, 2023 | 19A |
| Howard 1st Rep. Revised Ex. B | Revised Exhibit B to the June 7, 2023 Opening Report of Plaintiff's expert witness Christopher Lee Howard, produced by Plaintiff on July 18, 2023 | 19B |

| Abbreviation | Description | Exhibit No.[1] |
|---|---|---|
| Howard 2nd Rep. | Supplemental Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated December 1, 2023, without exhibits or appendices | 20 |
| Howard 2nd Rep. Ex. A | Exhibit A to the Supplemental Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated December 1, 2023 | 20A |
| Howard 2nd Rep. Ex. B | Exhibit B to the Supplemental Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated December 1, 2023 | 20B |
| Howard 3rd Rep. | Supplemental Sur-Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated February 8, 2024, without exhibits or appendices | 21 |
| Howard 3rd Rep. Ex. A or Howard Final Ex. A | Exhibit A to the Supplemental Sur-Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated February 8, 2024 | 21A |
| Howard 3rd Rep. Ex. B or Howard Final Ex. B | Exhibit B to the Supplemental Sur-Rebuttal Expert Report of Plaintiff's expert witness Christopher Lee Howard, dated February 8, 2024 | 21B |
| New DSS Comment History | DSS comment history produced by IQVIA on September 11, 2023 | 22 |
| New Mebos Comment History | Mebos comment history produced by IQVIA on October 27, 2023 | 23 |
| DVI Report | Fax Machine Inspection Report of neutral expert, DVI Communications, Inc., dated October 17, 2022 | 24 |
| First Hospital Decl. | Declaration of Wilkes-Barre Hospital Company, LLC, d/b/a Wilkes-Barre General Hospital, dated May 8, 2023 | 25 |
| Plf. Resp. to IQVIA Rog. | Plaintiff's Responses to IQVIA's First Set of Interrogatories, dated March 30, 2022 | 26 |
| IQVIA's Resp. to 30(b)(6) Notice | IQVIA's Amended Responses to Plaintiff's 30(b)(6) Deposition Notice, served on October 27, 2023 | 27 |
| IQVIA0000061 | "Recruiting: DSS Screens" training | 28 |

| Abbreviation | Description | Exhibit No.[1] |
|---|---|---|
| IQVIA0003760 | National Disease and Therapeutic Index ("NDTI") fax addressed to ██████████, dated December 13, 2018 | 29 |
| IQVIA0007820 | NDTI fax addressed to ██████, dated December 13, 2018 | 30 |
| IQVIA0093478 | NDTI fax allegedly received by Plaintiff on June 29, 2018 | 31 |
| IQVIA0115816 | NDTI fax addressed to █████, dated November 27, 2018 | 32 |
| IQVIA136702 | NDTI fax addressed to ██████, dated November 20, 2018 | 33 |
| IQVIA0142244 | NDTI fax addressed to ███████, dated November 27, 2018 | 34 |
| IQVIA0365140 | Extract of DSS comment history for Plaintiff | 35 |
| IQVIA0443625 | NDTI fax notification email addressed to ████████, dated August 3, 2018, with attachment | 36 |
| IQVIA0475242 | December 29, 2017 email from Louie Mateo to himself | 37 |
| IQVIA0477164 | Channel Dynamics ("CD") productivity tracker for 2016 and 2017 | 38 |
| IQVIA0617355 | CD Fax allegedly received by Plaintiff on June 23, 2017 | 39 |
| IQVIA0641319 | CD fax addressed to ██████, dated September 27, 2016 | 40 |
| IQVIA0653217 | CD fax addressed to ████████, dated September 27, 2016 | 41 |
| IQVIA0653265 | CD fax addressed to ███████, dated September 23, 2016 | 42 |
| IQVIA0665710 | Fax notification email for CD fax addressed to █████ ████████, dated September 27, 2016, with attachment | 43 |

| Abbreviation | Description | Exhibit No.[1] |
|---|---|---|
| IQVIA0977475 | CD fax addressed to ███████, dated September 22, 2016 | 44 |
| IQVIA0975549 | CD fax addressed to ███████, dated September 22, 2016 | 45 |
| IQVIA1005886 | Excerpts of National Disease & Therapeutic Index (NDTI) and Integrated Promotional Services (IPS) Recruitment and Panel Administration Comprehensive Training – March 2013 | 46 |

## I.    INTRODUCTION

Plaintiff concedes that individualized issues predominate as to which healthcare providers ("HCPs") received a fax from IQVIA Inc. ("IQVIA") (i) without consent (ii) on equipment that meets the definition of a "telephone facsimile machine" under the Telephone Consumer Protection Act ("TCPA").  This admission is dispositive.  Plaintiff's motion for class certification should be denied on this basis alone, as well as the additional, independent grounds below.

***First***, IQVIA had a standard policy of calling HCPs to secure their consent to receive faxes before attempting to send them faxes, and regularly documented this consent in "call notes." Plaintiff's own expert found documented evidence of consent for ***89%*** of the HCPs in this case. For the remaining 11% of the class, Plaintiff tacitly concedes that individualized inquiries are necessary to confirm consent by having his own counsel attempt (unsuccessfully) to perform some of them.  However, because counsel's so-called "manual review" is incomplete, subjective, belatedly-disclosed, and unreliable, the Court cannot rely on it to certify a class here.

***Second***, individualized inquiries are necessary to ascertain which HCPs received faxes using an online fax service.  The plain language of the TCPA excludes online fax services from its definition of a "telephone facsimile machine," as confirmed by recent Circuit Court and Federal Communications Commission ("FCC") authorities.  Plaintiff cannot sidestep this requirement through his expert's baseless say-so that—contrary to the TCPA's statutory language—all fax receiving equipment qualifies as a "telephone facsimile machine."  As the parties agree that no classwide evidence shows the fax receiving equipment of each HCP, individualized inquiries are necessary to identify those who used online fax services.  And Plaintiff's proposed claims process cannot resolve the individualized inquiries without violating IQVIA's due process rights.

***Third***, Plaintiff's circular and "fail-safe" class definition lacks "objective criteria" or a "reliable and administratively feasible mechanism" to ascertain class members.  Given the individualized inquiries admittedly necessary here, Plaintiff cannot show his class is ascertainable.

***Fourth***, Plaintiff is an inadequate and atypical class representative because he is subject to unique defenses, including as to his fax equipment, that will distract from the core issues to the detriment of the class.

***Fifth***, Plaintiff's counsel are not adequate class counsel, because they interjected themselves as necessary fact witnesses here by attempting to perform an individualized "manual review" of HCP records purportedly to identify class members who may have a valid claim.

***Sixth***, a class action is not a superior method for fairly and efficiently adjudicating this dispute, where individualized inquiries require tens of thousands of mini-trials, and due process limits the aggregated statutory damages that may be awarded to a class.

Accordingly, Plaintiff fails to meet his burden to show ascertainability, and fails to satisfy the requirements of Rule 23(a) and 23(b).  Each failed element provides an independent ground for the Court to deny Plaintiff's motion for class certification here.

## II.     FACTUAL BACKGROUND

On November 14, 2019, Plaintiff Richard E. Fischbein, MD, filed a putative class action alleging a single TCPA claim based on his alleged receipt of two informational faxes from IQVIA on his "telephone facsimile machine" without his consent.  (ECF No. 1 ("Compl.").)  After over three years of discovery, Plaintiff filed his motion to certify a class defined as: "All persons: (1) who were sent one or more facsimiles between November 16, 2015, and January 10, 2019, inviting a healthcare professional to register or participate in the National Disease and Therapeutic Index or Channel Dynamics survey in exchange for points to be redeemed for rewards; (2) who never registered or participated in either survey; (3) for whom Defendant has produced no evidence of

consent to be sent the invitation by facsimile transmission; and (4) who are listed in Exhibit B to the '(Supplemental Sur-Rebuttal) Expert Report of Lee Howard' dated February 8, 2024." (ECF No. 87 ("Mot.") at 1.) IQVIA opposes the Motion because no class can be certified here.[2]

### A. The Faxes Invited HCPs to Participate in IQVIA Research Studies.

IQVIA specializes in healthcare technology and clinical research solutions that advance healthcare innovation and better outcomes for patients, including two research studies called the National Disease and Therapeutic Index ("NDTI") and Channel Dynamics ("CD").



The NDTI is a ███████████████████████████ ███████████████████████████████████████████████ (Ex. 46, IQVIA1005886 at IQVIA1005898.) The data gathered through NDTI is used by the ███████████████████████████████████████████████ ██████████████████████████ in many ways, such as ███████████████████ ██████████████████████████████ (*Id.* at IQVIA1005900-904; Foster Tr. 25:22-26:1.) For instance, NDTI data was used in 2012 to track the ██████ ████████████ (Ex. 46, IQVIA1005886 at IQVIA1005902.) NDTI was ██████████ █████████████. (Foster Tr. 33:13-23.)

The CD study measures ██████████████████████████ █████████████ (Ex. 46, IQVIA1005886 at IQVIA1005929.) CD was originally known as ███████████████████████████, and is also sometimes referred to in the record as the ███████████████████████ (Foster Tr. 27:24-28:6, 35:11-23.)

---

[2] Another TCPA case brought against IQVIA, *Lyngaas v. IQVIA*, No. 2:20-cv0-02370, is currently pending before this Court. Some of the issues barring certification in *Lyngaas* likewise bar certification here, including the absence of *any* evidence to ascertain which HCPs used an online fax service, which falls outside the scope of the TCPA. In other respects, however, the present case is different as it involves different faxes, that were attempted to be sent to different HCPs, with different documented consent evidence.

One of the many ways IQVIA recruited HCPs to participate in the NDTI and CD studies was through informational fax invitations.  The NDTI and CD faxes (the "Faxes") provided background information about each study and invited HCPs to participate by completing a form and returning it to IQVIA.  (Compl., Ex. A; Ex. 39, IQVIA0617355.)  IQVIA acknowledges HCP participation in the studies ███████████████████████████████████████████████ ███████████████████████████████.  (Compl., Ex. A; Ex. 39, IQVIA0617355; *see* Foster Tr. 154:1-4.)  The Faxes do not offer to sell anything to the HCPs, and certainly do not "advertise the commercial availability or quality" of any IQVIA products or services.  47 U.S.C. § 227(a)(5).  (Compl., Ex. A; Ex. 39, IQVIA0617355.)[3]



(Foster Tr. 67:3-5, 74:6-7; De Zuniga Tr. 42:17-25.) ██████████████ ████████████████████████████████████████████████████ (*See*, *e.g.*, Ex. 43, IQVIA0665710-11; Ex. 36, IQVIA443625-26.) ████████████████████████ ██████████████.  (Foster Tr. 218:24-219:7.)

IQVIA produced lists of the subset of HCPs who registered and participated in the NDTI and CD studies from 2005 to 2022 ("Panelist Lists").  (Cheung Decl., ¶ 59; *see* Cabrey Tr. 258:13-259:18, 263:18-24, 266:6-8, 268:5-7.)  The record further includes reports from IQVIA's vendor,

---

[3] In its motion to dismiss, filed on March 5, 2021, IQVIA argued that the Faxes were not advertisements under the TCPA.  (ECF No. 24.)  On July 30, 2021, the Court denied the motion to dismiss and found that Plaintiff had "alleged facts sufficient to state a plausible claim for relief." (ECF No. 33 at 8.)  The parties agree that whether the Faxes are advertisements is not an issue to be decided at class certification.  (*See* Mot. at 1-2.)  But at the appropriate time and based on the complete record, this Court should hold that the Faxes are not advertisements because they do not advertise or even mention any IQVIA "property, goods, or services" that are "commercial[ly] availab[le]" to the Fax recipients.  *See* 47 U.S.C. § 227(a)(5).



("Point Balance Reports").  (Foster Tr. Ex. 29; *see* Foster Tr. 197:1-13.)  Both parties agree that participation in the NDTI and CD studies shows indicia of consent to receive a Fax, and Plaintiff purports to exclude these HCPs from his proposed class.  (Mot. at 2.)

**B.     IQVIA Had a Policy to Obtain Consent from Each HCP Prior to Attempting to Send the NDTI and CD Faxes.**

(Foster Tr. 88:24-89:2; De Zuniga Tr. 105:24-106:9; Francisco Tr. 170:22-171:4; Chavez Tr. 142:1-11; Mateo Tr. 47:24-48:1, 49:23-50:5.)

(Foster Tr. 272:13-22.)

.

(*Id*. 98:18-99:1.)

(Foster Tr. 99:2-14.)

(Foster Tr. Ex. 11 at IQVIA000001; *see* Foster Tr. 106:12-21, 110:23-112:2, 267:24-269:5, 270:17-25.[4])

(Foster Tr. Ex. 11 at IQVIA000001; Foster Tr. 271:1-13.)

(Foster Tr. Ex. 11 at

---

[4] Plaintiff's Exhibit 11 and Defendant's Exhibit 6 from Mr. Foster's deposition are identical.

IQVIA0000002-3.) ███████████████████████████ (Foster Tr. Def. Ex. 7;

*see* Foster Tr. 276:22-279:19; Foster Tr. Def. Ex. 8.)

████████████████████████████████████████████

████ . (*See*, *e.g.*, Foster Tr. Ex. 10.) ███████████████████

████████████████████████████████████████████

██████████████████████████████████ (Foster Tr. 274:2-18; *see* Mateo

Tr. 49:23-50:5 ███████████████████████████████████

████████████████████████████████████████████; Foster

Tr. 104:11-18 ████████████████████████████.)

    IQVIA also secured consent to send NDTI and CD Faxes through a different study called

the ██████████████████████████████████████████

████████ (Foster Tr. 36:21-37:2.) ████████████████████

████████████████████████ (*Id.* 77:16-78:6 ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████ (Foster Tr. Def. Ex. 1 at IQVIA477166; *see* Foster Tr. 246:11-17, 247:7-11.) ███

████████████████████████████████████████████

████████████████████ (Foster Tr. Def. Ex. 1 at IQVIA477166.)

    **C.**    **NDTI and CD Recruiters Documented Consent From HCPs to Receive Faxes in IQVIA's Systems.**

████████████████████████████████████████████

██████████████████████████████████ (Foster Tr. 116:4-13; Mateo

Tr. 68:15-18.)

1.      **IQVIA Used DSS To Record Consent Until Late-2017 to Early-2018.**

At the start of the putative class period, ███████████████████████████████

████████████████████████████ (Cabrey Tr. 73:24-74:11.)  From the second half of 2017

to the beginning of 2018, █████████████████████████████████████████

(Foster Tr. 29:2-7, 70:8-14.)

███████████████████████████████████████████████ (*Id.*

81:3-13.) ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ (Deal 1st Rep. ¶ 20.) ████

███████████████████████████████████████████

██████████████████████████████████████ (IQVIA's

Resp. to 30(b)(6) Notice at 9.) ████████████████████████

████ (Cheung Decl. ¶ 29.) ██████████████████████

██████████ (IQVIA's Resp. to 30(b)(6) Notice at 10.)

██████████████████████████ (Cheung Decl. ¶ 30; *see* IQVIA's

Resp. to 30(b)(6) Notice at 10.)

2.      **IQVIA Transitioned From DSS to Mebos By 2018.**

█████████████████████████████████████████████

█████████████████████ (Foster Tr. 81:3-8, 81:14-16.) ████████

█████████████████████████████████████████████

(IQVIA's Resp. to 30(b)(6) Notice at 8.) ███████████████

████████████ (*Id.*)

█████████████████████████████████████████████

██████████ (Cheung Decl. ¶ 31; IQVIA Resp. to 30(b)(6) Notice at 8.) ████



████████████████████████████████████████████████████████████████████

██████████████████████████████████████ (Cheung Decl. ¶ 32; IQVIA's Resp. to 30(b)(6)

Notice at 9.)

████████████████████████████████████████████████, and contains several

fields relevant to this case, as shown below.  (Foster Tr. 116:14-21.)

██████████████████████████████████ (Foster Tr. 188:24-189:3; *see also* Cabrey Tr.

191:15-25.) █████████████████████████████████████████

████████████████████████████████ (Foster Tr. 189:4-11; *see also* Cabrey Tr.

272:15-22.) █████████████████████████████████████

(Foster Tr. 189:12-15; *see also* Cabrey Tr. 273:4-7.) ███████████████████

█████████████████████████████████████████████

████████████████████████████████ (Cabrey Tr. 273:8-24.)

However, because ███████████████████████████████████

████████████████████████ data does not capture all historical consent provided to receive Faxes.

For example, ████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████ (Foster Tr. 292:22-293:24; Foster Tr. Def. Ex. 12.)

### 3.      Recruiters Also Documented Consent in Productivity Trackers.

███████████████████████████████████████████████████████

███████████████████████████████████████ (Mateo Tr. 70:1-7.) ████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████ (Foster Tr. 206:21-207:2,

209:23-210:2, 213:13-18, 214:11-15, 215:7-24, 302:3-16.) ██████████████

███████████████████████████████████████████████████████

████████████████████████████████ (Mateo Tr. 70:8-18; Chavez Tr. 115:11-

116:9.) ███████████████████████████████████████████

█████████████████████████████ (Francisco Tr. 90:10-25.) ████████

████████████████████████████████████ (Ex. 37, IQVIA475242

(Mateo emailing 58 separate text files to himself in 2017).) █████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ (Deal

1st Rep. ¶¶ 50-56.)   Plaintiff's expert, Christopher Lee Howard, did not dispute this: in fact,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ (Howard 2nd Rep. ¶ 7; *see* Section II, D., *infra*.)

### 4.      IQVIA Provided Recruiters with Recommended Terminology for Call Notes, But Recruiters Recorded Consent in Various Ways.

IQVIA did not ████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ (Foster Tr. 140:11-21; *see* Ex. 28, IQVIA00061 at IQVIA000067.)

For example, in general, ████████████████████████████████████████

█████ (*Id.*)  Recruiters themselves also ████████████████████████████

███████████ (Foster Tr. 140:11-21.)  For example, ████████████████████

████████████████████████ (*Id.* 138:25-139:12, 140:11-21; Francisco Tr. 111:14-23.)

When used, ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ (Mateo Tr. 82:16-83:4, 87:21-88:5, 164:17-

165:1; Francisco Tr. 111:24-112:7.) █████████████████████████████████

█████████ (Mateo Tr. 102:17-103:16.)

As to Plaintiff, for instance, IQVIA produced the following ████████████:



(Ex. 35, IQVIA365140.)   Plaintiff allegedly received ████████████████ (Ex. 39,

IQVIA0617355), and NDTI Faxes on November 29, 2017 (Compl., Ex. A), ██████████ (Ex.

30, IQVIA093478), and July 24, 2018 (Compl., Ex. B). █████████████████████

███████████████████████████████████████████████████ (Mateo

Tr. 123:16-124:16, 155:3-10.)   During the call, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ (*Id.* 82:16-19, 123:16-

---

[5] ████████████████████████████████ (Foster Tr. 133:23-25.)

[6] ███████████████████████████████████████ As discussed
below, to the extent Plaintiff disputes IQVIA's adherence to the policy as to any HCP,
individualized inquiries are necessary to resolve this dispute. (*See* Section IV.A.1., *infra*.)

124:16.)  Plaintiff's office manager, Lauren Estock,[7] ███████████████████████

███████████████████████████████████ (Estock Tr. 26:7-8, 257:1-4.)

Despite these common abbreviations and practices, as Plaintiff concedes, ███████

████████████████████████████████████████████████████████████

██████████████████ (ECF No. 87-25 ("Oppenheim Decl.") ¶ 29.)

> ### D.     Even Howard's Flawed Automated Analyses Revealed Indicia of Consent for the Vast Majority of HCPs.

Howard submitted an Opening Report on June 6, 2023 ("First Report"), a Supplemental

Rebuttal Report on December 1, 2023 ("Second Report"), and a Supplemental Sur-Rebuttal Report

("Third Report") on February 2, 2024.

In his First Report, ██████████████████████████████████████

████████████████ (Howard 1st Rep. ¶¶ 26–27.) ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (*Id.*

¶ 37; Howard 1st Dep. 72:13-73:3.) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Howard 1st Rep. ¶¶ 23-27.) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ (*Id.* ¶ 30.) ████████████████████

---

[7] It is likely that the ████████ in the call notes was intended to refer to Lauren Estock, Dr. Fischbein's office manager.

[8] ████████████████████████████████████████████████████████
██████████████████████████████. (Deal 3rd Rep. ¶ 14.) ████████████████
████████████████████████████████████████ (*Id.*)

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████    (*Id.* ¶ 31.) ████████████████████

██████████████████████████████████████████████████

████████████████████████████████████  (*Id.* ¶ 32.) ████████████

██████████████████████████████████████████████████

████████████████  (*Id.* ¶ 34.)

         ████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████    (Howard 1st Rep., Appendix E; *see* IQVIA's Motion to Exclude

Certain Opinions of Plaintiff's Expert (ECF No. 93) ("Mot. to Exclude") at 4-5.)

         On July 13 and 18, 2023, Plaintiff produced revised Exhibits A and B, with additional

process documentation ████████████████████████████████ (Howard 1st

Rep. Revised Code; Howard 1st Dep. 89:12–15.)   Revised Exhibit A included ████████

████████████████████████████████████ and revised Exhibit B included

██████████████████████████████████ (Howard 1st Rep. Revised

Ex. A; Howard 1st Rep. Revised Ex. B; Howard 1st Dep. 100:19–22.) ████████████

██████████████████████████████████████████████████

██████████████████████████████████ (Howard 1st Dep.

102:8–12.)

         IQVIA's expert, Deal, submitted an Opening Report on July 10, 2023.  Deal's First Report

██████████████████████████████████████████████████

---

⁹ ███████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████ (*see* Section II.C.3., *supra*); and ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ (Deal 1st Rep. ¶¶ 50-56, 69 n.116, 41-45.) ██████████████████████

███████████████████████████████████████████████████████

████████████ (Deal 2nd Rep. ¶¶ 36–38.)

In his Second Report, in response to some of Deal's criticisms, Howard ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ (Howard 2nd Rep. ¶¶ 11, 87, 89.) ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ (Howard 2nd Dep.

18:23-19:10, 19:23-20:1, 20:11-22:17.) █████████████████████████

███████████████████████████████████████████

Last, ███████████████████████████████████████ (*see* Section

II.E., *infra*), ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ (Howard 2nd Rep. ¶ 7(6).)

---

[10] Deal ████████████████████████████████████████████████

███████████████████████████████████████ (Deal 1st Rep. ¶¶ 39-41.)

In his Third Report, Howard repeated the same steps, with two changes. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ (Howard 3rd Rep. ¶ 12; Howard 2nd Dep. 108:16-21.)

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

(Howard 3rd Rep. ¶ 12.) ████████████████████████████████████████

████████████████████████████████████ (Howard 2nd Dep. 121:5-122:2.)  Finally,

again, ████████████████████████████████████████████

████████████████ (*See* Section II.E., *infra*.)  The ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ (Howard 3rd Rep. ¶ 6(5).)  (Mot. to Exclude at 25-26.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ (*See*

Section II.B., *supra*.)  As a result, Howard's inability to find documented consent for the remaining

████ of the putative class does not mean that those HCPs did not consent to receive the Faxes,

particularly given the unreliable and incomplete methodology used for Howard's purported data

analysis and Plaintiff's counsel's purported manual review.  (*See* Section IV.B.1., *infra*.)

### E.     Plaintiff's Counsel Then Purported to Manually Review Thousands of Individualized IQVIA Records.

Given the various calling and note-taking practices of each IQVIA recruiter, Howard's

analysis could not demonstrate that common questions would predominate over individualized

inquiries in resolving the consent question.   As a result, astonishingly, ***Plaintiff's counsel*** purported to carry out some of this individualized manual review.

At the outset, the methodology and results of counsel's "manual review" were not disclosed to IQVIA until the filing of Plaintiff's present Motion, when Plaintiff belatedly filed a supporting declaration from his counsel, David Oppenheim.   (*See* Oppenheim Decl.) ███████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ (Howard 2nd Rep. ¶ 7(4); Howard 3rd Rep. ¶ 6(5).)   Yet Plaintiff's counsel withheld disclosure of his methodology and results until months later, on March 15, 2024, well after the close of expert discovery.   As a result, IQVIA has had no prior opportunity to examine, let alone challenge, counsel's manual review, and the Court should not permit Howard or Plaintiff to rely on it.

Even if considered, Oppenheim's methodology is improper, unreliable, and incomplete. According to the Oppenheim Declaration, █████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ (Oppenheim Decl. ¶ 31.)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ (*Id.* ¶ 33.) ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ (*Id.* ¶¶ 32-33.)

████████████████████████████████████████████████████

████████████████████████████████████████████████████████



(*Id.* ¶¶ 18-19.) ████████████████████████████

████████████████████████ (*Id.* ¶ 19.)

██████████████████████████████████

██████████████████████████████████

████████████████ (*Id.* ¶ 37.)  As discussed in IQVIA's Motion to Exclude, Howard

followed these instructions blindly, without any understanding of counsel's so-called methodology

for inclusion or exclusion.  (Mot. to Exclude at 18-20.) ████████████████████

██████████████████████████████████

████████████████████ (Howard 2nd Dep. 43:7-19, 43:23-

44:6, 122:3-123:7.) ███████████████████████████

█████████████ (Howard 2nd Dep. 44:11-15, 123:17-25.)

███████████████████████████████████

████████████████████ (Oppenheim Decl. ¶¶ 19-20, 42.)

**F.      There Are No Records that Identify Whether Putative Class Members Used an Online Fax Service During the Relevant Time Period.**

On their face, the fax notification emails do not contain ***any*** information about the

equipment on which an HCP allegedly received a Fax, or whether an HCP subscribed to an online

fax service. ████████████████████████ (Howard 1st Dep. 268:2-6; Bress 1st

Rep. ¶ 45.)  Tom Coombs, the Director of Sales for the XMedius Solution Group at OpenText,

confirmed that there is no way to tell whether any Fax that IQVIA attempted to send using

XMedius was received through an online fax service.  (Coombs Tr. 68:12-21.)

### G. The Record Does Not Show What Type of Faxing Equipment the Named Plaintiff Used.

Plaintiff used Brother IntelliFAX-2840 fax equipment during the putative class period. (Plf. Resp. to IQVIA Rog. at 3.)  DVI Communications ("DVI") inspected Plaintiff's fax equipment at his office, located in First Hospital.  (*Id.* at 2.)  However, ███████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████  (DVI Report at 18.) ████████████████████████████████████  (First Hospital Decl. ¶¶ 3-4.)  Further, although ██████████████████████████████████████████████████ ████████████████████████████  (*id.* ¶ 9), ██████████████████████████ ████████████████████████  (Fischbein Tr. 229:14-22.)

## III.   LEGAL STANDARD

Plaintiff bears the burden of showing by a "preponderance of the evidence" that the "class is ascertainable," *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir. 2013), and in "compliance with the requirements of [Federal Rule of Civil Procedure] 23." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir.), *as amended* (Apr. 28, 2015).

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (citation omitted).  "If class members are impossible to identify *without extensive and individualized fact-finding or 'mini-trials*,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (emphasis added).  "The proposed method for ascertaining a class must be supported by evidence; mere assurances of the ability to ascertain a class in the future are insufficient." *Howard v. LVNV*

*Funding, LLC*, No. 3:19-cv-93, 2023 WL 2660174, at *3 (W.D. Pa. Mar. 22, 2023) (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).

Plaintiff also bears the burden of establishing all requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and both elements of Rule 23(b)(3)—predominance and superiority. *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469 n.1 (3d Cir. 2020). "If a district court harbors uncertainty about whether the plaintiff has satisfied the requirements of Rule 23, class certification should be denied." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 130 (3d Cir. 2023).

At class certification, Plaintiff must show that all of the elements of the TCPA claim, ***as well as all affirmative defenses***, can be resolved at trial using common evidence. *See Marcus*, 687 F.3d at 600 ("A plaintiff must 'demonstrate that the element of the [legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" (citation omitted)); *Webster v. LLR, Inc.*, No. 2:17cv225, 2018 WL 10230741, at *12 (W.D. Pa. Aug. 20, 2018) (concluding that plaintiffs failed to meet their burden of demonstrating that defendant's affirmative defense could be adjudicated through classwide evidence). This means that Plaintiff must demonstrate through common, classwide evidence that *each* putative class member: (i) successfully received (ii) an "unsolicited advertisement" (iii) on a "telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). If the resolution of putative class members' claims or IQVIA's affirmative defenses require individualized inquiries, class certification should be denied. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 186 (3d Cir. 2009).

## IV.  ARGUMENT

### A.  Plaintiff Fails to Satisfy Commonality or Predominance.

This Court should deny class certification because individualized inquiries predominate regarding which (if any) HCPs did not consent to receive a Fax, and which HCPs received a Fax on a "telephone facsimile machine." Each is an independent reason to deny Plaintiff's Motion.

### 1. Individualized Inquiries Predominate Regarding Whether Each Putative Class Member Consented to Receiving a Fax.

The evidence is clear and undisputed: IQVIA had a standard policy of securing consent before attempting to send a Fax to any HCP. (*See* Section II.B., *supra*.) ████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████. (*See* Section II.D.,

*supra*.) ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████ (*See* Sections II.C., D., *supra*.)

To the extent that any putative class member disputes the consent that was obtained through IQVIA's standard practice and policy, individualized inquiries are necessary to determine if any of the remaining ███ of HCPs did *not* consent to receive a Fax. As a result, individualized inquiries predominate and class certification should be denied. *Marcus*, 687 F.3d at 593.

#### a. In Performing a Manual Review, Plaintiff Concedes that Individualized Inquiries Are Necessary to Determine Consent.

Plaintiff's counsel ████████████████████████

████████████████████████ (Oppenheim Decl. ¶ 29.)

In Plaintiff's counsel's own words, as to the DSS Comment History:

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████

(*Id*. ¶¶ 29-30 (emphasis added).)   Plaintiff's counsel thus concedes that "individualized fact-finding" is necessary to resolve consent, demonstrating that class certification is inappropriate here. *Marcus*, 687 F.3d at 593.   Because Plaintiff concedes that he cannot show that each of the TCPA elements are "capable of proof at trial through evidence that is ***common to the class rather than individual to its members***," class certification must be denied here. *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127-28 (3d Cir. 2018) (emphasis added) (citation omitted).

        **2.**      **Individualized Inquiries Predominate Regarding Whether Each Putative Class Member Received a Fax on a Telephone Facsimile Machine.**

Individualized inquiries are necessary to determine which HCPs received a Fax on a "telephone facsimile machine" covered by the TCPA.   The plain language of the TCPA makes clear that only certain equipment can meet the statutory definition of a "telephone facsimile machine," and, as the Fourth and Ninth Circuits and the FCC have confirmed, an online fax service does not meet that definition.   Here, as Plaintiff concedes, there is no classwide evidence showing whether each HCP used an online fax service.   Individualized inquiries thus predominate on this issue as well, requiring denial of certification.

        **a.**      **Under the Plain Language of the TCPA, Online Fax Services Do Not Qualify as "Telephone Facsimile Machines."**

The plain language of the TCPA controls.   "It is well established that 'when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citation omitted); *see Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011) ("If the statute's plain language is unambiguous and expresses [Congress's] intent with sufficient precision, [the Court] need not look further.").

The TCPA regulates the "use [of] *any telephone facsimile machine, computer, or other device* to send, *to a telephone facsimile machine*, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C) (emphases added).  The plain language notably distinguishes between sending and receiving fax equipment.  Sending equipment is broad, and includes "any telephone facsimile machine," "computer," or "other device."  *Id.*  In contrast, the *only* receiving equipment covered by the TCPA is a "telephone facsimile machine."  *Id.*  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587-88 (3d Cir. 2020) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).  The intentional omission of "computer" and "other device" from the definition of *receiving* fax equipment makes clear that not all equipment qualifies as a "telephone facsimile machine."  That is particularly true here, where the disparate language appears in the *same sentence* in the statute.

The TCPA defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, *from paper* into an electronic signal and to transmit that signal over a *regular telephone line*, or (B) to transcribe text or images (or both) from an electronic signal received over a *regular telephone line onto paper*."  47 U.S.C. § 227(a)(3) (emphasis added).  In other words, to qualify as a "telephone facsimile machine" under the TCPA, the fax receiving equipment must (1) receive the fax transmission over a *regular telephone line*, and (2) have the capacity to print the fax *onto paper*.  Without these technical requirements, there would be no difference between these distinct phrases chosen by Congress: a "telephone facsimile machine" versus a "computer[] or other device."

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████  (Howard

2nd Rep. ¶ 14.)   Howard makes no distinction between a "telephone facsimile machine," a "computer," or any "other device," and thus incorrectly applies the same definition to both sending and receiving fax equipment.  *See Riccio*, 954 F.3d at 587 (holding that in statutory interpretation, courts must "refrain from concluding [] that the differing language in the [various] subsections has the same meaning in each" (quoting *Russello*, 464 U.S. at 23)).   Indeed, Mr. Howard's interpretation would mean that *any* device, including a smartphone, is a "telephone facsimile machine," in violation of the plain language of the statute.  This cannot be.

> **b.      The TCPA's Legislative History Shows That Faxes Sent to Online Fax Services Do Not Implicate the Harms the TCPA was Designed to Address.**

The TCPA's legislative history also makes clear that the TCPA was not intended to apply to online fax services.  The Third Circuit examines the legislative history to help interpret a statute. *Paskel v. Heckler*, 768 F.2d 540, 543 (3d Cir. 1985).  "In enacting the TCPA, Congress intended to *remedy* [i] *the telemarketer's attempts to 'shift[ ] some of the costs* of advertising from the sender to the recipient' like ink and paper and [ii] the *telemarketer 'occup[ying] the recipient's facsimile machine* so that it is unavailable for legitimate business messages while processing and printing the junk fax.'"  *Cmty. Vocational Schs. of Pittsburgh, Inc. v. Mildon Bus Lines, Inc.*, 307 F. Supp. 3d 402, 414 (W.D. Pa. 2018) (emphasis added) (quoting H.R. Rep. No. 102-317, at *10 (1991)).

The Fourth Circuit analyzed the TCPA's legislative history and intended harms and concluded that online fax services did not implicate those harms.  *Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 210-11 (4th Cir. 2024) (summarizing the 1991 Report

of the House Committee on Energy and Commerce recommending the TCPA's enactment). Specifically, Congress identified "two reasons" why unwanted faxes could be "problematic": (1) they wasted ink and paper; and (2) they made single phone lines unavailable for legitimate business messages. *Id.* at 210. It held that "[w]hile those problems continue to exist with stand-alone fax machines, they do not exist with online fax services, as the recipient can choose whether [to] print a particular fax and there can be multiple incoming transmissions at once." *Id.* at 210-11. ███

████████████████████████████████████████

████████████████████████████████████ (Howard 2nd Dep. 192:5-9, 224:18-225:4). Accordingly, faxes sent to online fax services do not implicate the harms the TCPA was intended to combat, and the legislative history confirms that such faxes fall outside the scope of the TCPA.

### c. Multiple Circuit Courts and the FCC Have Confirmed that Online Fax Services Fall Outside the Scope of the TCPA.

The Fourth and Ninth Circuits and the FCC have confirmed IQVIA's interpretation of the TCPA. Indeed, the Fourth and Ninth Circuits have *declined* to certify TCPA classes where individualized inquiries are necessary to identify online fax service recipients.

Earlier this year, the Fourth Circuit held that, "pursuant to its plain statutory language, the TCPA prohibits the sending of unsolicited advertisements to . . . 'standalone fax machines,' but not to . . . 'online fax services.'" *Career Counseling*, 91 F.4th at 209. The Fourth Circuit reasoned that "an online fax service neither receives an electronic signal 'over a regular telephone line' nor has the capacity to transcribe text or images 'onto paper,'" as required by the TCPA, because "online fax services receive faxes over the Internet and cannot themselves print any faxes." *Id.* at 210. Specifically, the Fourth Circuit determined that "online fax services hold inbound faxes in digital form on a cloud-based server, where the user accesses the document via the online portal

or via an email attachment," and "[w]hen faxes are sent to such online fax services, the recipients 'can manage those messages the same way they manage email by blocking senders or deleting incoming messages without printing them" because they have "the option to view, delete, or print [the faxes] as desired." *Id.* at 209 (citations omitted). As a result, the Fourth Circuit held that "an online fax service . . . cannot be said to qualify as a 'telephone facsimile machine' under the TCPA." *Id.* at 210.

With respect to certification, the Fourth Circuit concluded that TCPA "class membership is properly limited to stand-alone fax machine users," and that individualized inquiries would be required "as to whether each recipient was using a stand-alone fax machine at the relevant time." *Id.* at 211. There, as here, the necessary individualized inquiries render "class certification 'inappropriate.'" *Id.*

Likewise, the Ninth Circuit held that online fax services fall outside the scope of the TCPA. In *True Health Chiropractic, Inc. v. McKesson Corp.*, it affirmed decertification of a TCPA fax class after holding that the TCPA does not apply to "faxes received through an online fax service." No. 22-15710, 2023 WL 7015279, at *2 (9th Cir. Oct. 25, 2023). Because "Plaintiffs had no viable methodology for distinguishing class members who had received faxes on a stand-alone fax machine and those who had received them through an online fax service," the Ninth Circuit concluded that "Plaintiffs could not prevail on their class claims." *Id.*

The FCC also reached the same conclusion, twice. The Commission has the authority to "prescribe regulations to implement the requirements" of the TCPA. 47 U.S.C. § 227(b)(2). In 2019, it ruled that an online fax service does not constitute a "telephone facsimile machine" within the "plain terms" of the TCPA. *In the Matter of Amerifactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling: Rules & Reguls. Implementing the Tel. Consumer Protection Act*

*of 1991 Junk Fax Protection Act of 2005*, 34 FCC Rcd. 11950, ¶¶ 2, 3, 11 (F.C.C. Dec. 9, 2019) ("*Amerifactors*").  Because an online fax service "cannot itself print a fax" and "the user of an online fax service must connect his or her own equipment in order to do so," the FCC determined that such a service "is plainly not 'equipment which has the capacity . . . to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.'" *Amerifactors*, ¶ 11.  It also ruled that "[f]axes sent to online fax services via an attachment that the consumer can delete without printing are effectively the same as 'email sent over the Internet,'" which "[u]nder [the FCC's] precedent . . . are not subject to the TCPA."  *Id.* (citation omitted).

The FCC reiterated its finding that an online fax service "does not meet the statutory definition of a 'telephone facsimile machine'" a year later in *In the Matter of Joseph T. Ryerson & Son, Inc. Petition for Declaratory Ruling, Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 35 FCC Rcd. 9474, ¶ 14 (F.C.C. Sept. 4, 2020) ("*Ryerson*") (citation omitted).  In *Ryerson*, as here, "it [was] undisputed that the document in question . . . was always a digital electronic file" because the fax transmission process started with Ryerson uploading a digital file of the fax to an online web portal managed by a third-party broadcaster, which was "subsequently sent electronically by the third-party service to [the recipient, who] then received the file as an email."  *Id.* ¶¶ 14, 16.  Since the transmission process started and ended as a "digital electronic file," the FCC held that faxes sent in this manner are "clearly distinguish[able] [from] faxes that begin as faxes," which were at issue in *In the Matter of Westfax, Inc. Petition for Consideration & Clarification, Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991 Junk Fax Protection Act of 2005*, 30 FCC Rcd. 8620 (F.C.C. Aug. 28, 2015) ("*Westfax*"), on which Plaintiff erroneously relies.  *Ryerson*, ¶ 16.  (Mot. at 20.)  In rejecting the argument that the *Ryerson* "transmissions are TCPA-covered faxes because they were eventually

sent to a computer that could [ultimately] print the message," the FCC observed that "[v]irtually all email could be accessed by computers with printing capabilities" but "emails do not implicate the consumer harms that are the TCPA's target, such as automatic printing." *Ryerson*, ¶ 16.  As a result, the FCC concluded that the technology at issue in *Ryerson*—like the online fax service in *Amerifactors*—was not covered by the TCPA.  *Id.* ¶ 14.[11]

                      **d.**    **Online Fax Services Are Technologically Distinct from Traditional "Telephone Facsimile Machines" Under the TCPA.**

Online fax services also do not meet the technical requirements of the TCPA's statutory definition of a "telephone facsimile machine" because they do not receive faxes over a "regular telephone line," and they lack capacity to print onto paper.   (Mot. to Exclude at 30-36.)

First, online fax services do not receive faxes over a "regular telephone line," because they do not use single, dedicated, or traditional analog phone lines.  Howard's contrary opinion[12] that a

████████████████████████████████████████████████████████████

████████ contravenes the plain meaning of the statute and renders superfluous the statutory term

---

[11] The FCC's rulings are binding on this Court under the Hobbs Act.  *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1113 (11th Cir. 2014) ("Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals"); *Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*, 340 F.R.D. 383, 389 (N.D. Cal. 2021) (finding it was bound by *Amerifactors* because it "is clearly final: it is not tentative and it determines rights and obligations under the TCPA").  In the alternative, the Court must defer to the FCC's interpretation of the TCPA under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019) (noting that FCC orders are subject to *Chevron* deference if Hobbs Act does not apply).  Finally, *Amerifactors* is an interpretive rule that applies retroactively.  *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007) (FCC declaratory rulings are adjudications); *AT&T v. FCC*, 454 F.3d 329, 332 (D.C. Cir. 2006) (agency adjudications are presumptively retroactive); *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, at *7 (E.D. Pa. Jan. 27, 2017), *aff'd sub nom. Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018).

12
████████████████████████████████████████████████████████████
████████████████████████████████████████ (Howard 2nd Dep. 217:15-218:17.)

"regular."  *See* 47 U.S.C. § 227(a)(3).  (*See* Howard 2nd Rep. ¶ 17; *see also* Mot. to Exclude at 34-36.)  In other words, his failure to distinguish among any of the various lines connected to the PSTN would improperly interpret the statute as encompassing *any* telephone line, thereby giving no effect to the term "regular" in the statutory phrase "regular telephone line."  *United States v. Williams*, 917 F.3d 195, 202 (3d Cir. 2019) ("A cardinal rule of statutory interpretation is that courts should avoid interpreting a statute in ways that would render certain language superfluous.").  Further, the common and ordinary meaning of "regular" is "normal" or "standard."  Howard's interpretation defies the "normal" or "standard" understanding of the type of phone line used at the time the TCPA was enacted. ██████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ (Bress 1st Rep. ¶ 19.) █

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ (*Id*. ¶¶ 20, 22.)  Thus, to avoid rendering the word "regular" superfluous, "regular telephone line" in this context should be interpreted to mean an analog telephone line.

Second, online fax services lack the capacity to print onto paper because they cannot do so on their own without substantial hardware or software modifications. ██████████████████████

██████████████████████████████████████████████ (*See* Howard 1st Dep. 256:12-19, 261:13-16.)  But his interpretation has no reasonable bounds, and contravenes the plain language of the TCPA, and the Fourth and Ninth Circuits' and FCC's rulings.  (*See* Mot. to Exclude at 30-33.)  Again, Howard eliminates the clear distinction Congress wrote into the plain language of the TCPA between broad *sending* versus narrow *receiving* fax equipment.  (*See* Section IV.A.2.a., *supra*.)  Further, █████████████████████████████████████████████



(Howard 2nd Dep. 226:9-16, 227:15-18.)

Howard's opinions as to what constitutes a regular telephone line and the capacity to print contravene controlling law, and the Court should not rely on Howard's opinions in construing the statutory phrase "telephone facsimile machine." (*See* Mot. to Exclude at 30-36.)

### e.   No Classwide Evidence Exists to Determine Whether Each Putative Class Member Used an Online Fax Service.

Because the receipt of a Fax on a "telephone facsimile machine" is a required element of a TCPA claim, Plaintiff must demonstrate that this element can be resolved through common evidence at class certification.  But Plaintiff concedes that no classwide evidence exists to identify HCPs' receiving equipment during the relevant time period.

(Howard 1st Dep. 268:2-6 (emphasis added).)

(*Id*. 269:25-270:6 (emphasis added).)[13]

As Plaintiff and his expert concede that individualized inquiries are necessary to determine which putative class members received Faxes through an online fax service, versus on a qualifying

---

[13] Implicitly acknowledging that he cannot satisfy commonality and predominance, Plaintiff suggests that the Court use a claims-administration process to identify class members who used an online fax service. (Mot. at 21.)  But this process would be nothing more than an end-run of Plaintiff's burden at class certification.  Plaintiff's proposed claims process would require each putative class member to attest to whether they satisfy an essential element of the TCPA, and would deny IQVIA its due process right to cross-examine or otherwise dispute each individual's claim.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 366-67 (2011) (affirming defendant's "right to raise any individual affirmative defenses" after plaintiff establishes claim for relief).

"telephone facsimile machine," Plaintiff cannot establish commonality or predominance.  Class certification is therefore precluded under Rule 23(b)(3).  *Career Counseling*, 91 F.4th at 211.

### B.       Plaintiff's Proposed Class Is Not Ascertainable.

#### 1.       Plaintiff Cannot Ascertain Which Putative Class Members Consented to Receiving IQVIA's Faxes.

Plaintiff fails to show that his proposed class is ascertainable, for two independent reasons. The class is defined to include only HCPs "for whom Defendant has produced no evidence of consent to be sent the invitation by facsimile transmission[.]"  (Mot. at 1.)  First, as Plaintiff's counsel identified these HCPs through their *own* manual, subjective review of evidence produced by IQVIA, the class is not defined "with reference to objective criteria."  *Byrd*, 784 F.3d at 163 (citation omitted).  Second, there is no "reliable and administratively feasible mechanism for determining whether" HCPs consented to receive the Faxes.  *Id.* (citation omitted).  Plaintiff's counsel concedes that individualized inquiries are necessary by attempting to undertake them, but their one-sided, incomplete, and error-prone manual review cannot reliably ascertain the class.

#### a.       Plaintiff's Class Is Not Defined With Objective Criteria.

Plaintiff proposes a class consisting of HCPs "for whom Defendant has produced no evidence of consent to be sent the invitation by facsimile transmission," and purports to list those HCPs in Howard's Final Exhibit B.  (Mot. at 1.)  Because the class definition relies on the results of *Plaintiff's counsel's* manual, subjective review, it cannot meet the standard for "objective criteria."  *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 291 (D.N.J. 2013) (denying certification where a class was defined to include "only those subscribers that 'received a reduced benefit from [Defendant] as a result'" and holding that the definition "suffer[ed] from an ascertainability problem," because it "require[d] fact-intensive inquiries that would place a serious administrative

burden on the Court" and was "not 'currently and readily ascertainable based on objective criteria'" (citations omitted)).

Indeed, to rely on Plaintiff's counsel's untested subjective "say-so" that no HCP in Howard's Final Exhibit B "███████████████████████████████████████████████ would be to deny IQVIA its right to due process.   (Oppenheim Decl. ¶ 48.)   "'[T]he root requirement' of the Due Process Clause [is] 'that an individual be given an opportunity for a hearing before he is deprived of any significant property interest.'"   *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (citation omitted); *see Ocasio v. Ciach*, 804 F. App'x 132, 136 (3d Cir. 2020) (there was a "denial of [plaintiffs'] right to procedural due process" where they were discharged for failing to submit to drug testing but "had no opportunity to explain or rebut the evidence" (citation omitted)).   Here, IQVIA has had no opportunity to analyze or challenge the methodology or results of Plaintiff's counsel's "manual review"; indeed, IQVIA did not even have this information until Plaintiff belatedly filed the Oppenheim Declaration three months after the review was performed.   (Howard 2nd Rep. ¶ 7(4); Howard 3rd Rep. ¶ 6(5).)   To certify the class based on Plaintiff's counsel's subjective review would impermissibly deny IQVIA's constitutional right to due process.   *Taggart v. GMAC Mortg., LLC*, 600 F. App'x 859, 864 (3d Cir. 2015) ("[W]here deprivation of a right cognizable under due process is conditioned on a certain factor, the government must provide an opportunity for 'consideration of that factor in its prior hearing.'" (citation omitted)).

Further, the Oppenheim Declaration and supporting exhibits do not provide process documentation or a description sufficient to allow IQVIA, or the Court, to determine what steps Plaintiff's counsel actually took.   For example, ██████████████████████████████
████████████████████████████████████████████████████████████████



(Oppenheim Decl. ¶ 19.)  But the Declaration does not state ████████████████████████████████████████. (*See*, *e.g.*, Howard 1st Rep. ¶ 37 (██████████████████████████████).)  Further, while Plaintiff's counsel claims to have ██████████████████████████████████ (Oppenheim Decl. ¶ 35.)  The absence of any documentation detailing the precise steps in Plaintiff's counsel's "manual review" makes it impossible for IQVIA to replicate that analysis, further underscoring the subjectivity inherent in Plaintiff's class definition.

> **b.** **There Is No Reliable and Administratively Feasible Mechanism for Determining the Members of Plaintiff's Proposed Class.**

Plaintiff's proposed class is not ascertainable for the same reasons that Plaintiff admits individualized inquiries are necessary: the comments in DSS flow over multiple rows, reflect inconsistencies and errors in how dates are captured, and contain normal human variation and typos in the recruiters' call notes.  (Oppenheim Decl. ¶ 29.)  Plaintiff's ***counsel's*** individualized review only highlights the need for individualized analysis and fails to establish a "reliable and administratively feasible mechanism" for identifying class members.  *Byrd*, 784 F.3d at 163 (citation omitted).

> **(i)** **Howard's Threshold Automated Analyses Are Flawed.**

The process by which Howard arrived at the Faxes listed in his Exhibit B ***prior*** to any manual review by Plaintiff's counsel is itself flawed, rendering counsel's attempt to filter out a certain subset of records for manual review inherently flawed as well.  As detailed in IQVIA's Motion to Exclude, Howard lacked any reliable or replicable methodology; failed to provide

sufficient process documentation for his work; relied on speculation and flawed assumptions about IQVIA's records; and then generated inconsistent and incoherent results.  (Mot. at Exclude at 16-30.)   His Final Exhibit B therefore does not reliably identify HCPs for whom there is no documented evidence of consent, even by his own metrics.

(ii)      <b>Plaintiff's Counsel's Manual Review Is Incomplete.</b>

Building on Howard's flawed analyses, Plaintiffs' counsel's subsequent manual review injected further flaws in the process because their review fails to account for *all* of the relevant consent evidence.



***First***, Plaintiff's counsel admittedly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Oppenheim Decl. ¶ 7 (counsel reviewed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮).)  This alone precludes class certification, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Section II.C.2., *supra*.)  Furthermore, the ▮▮▮▮ records are just as susceptible to the same human error, ambiguity, and typos as the ▮▮▮▮▮▮▮▮.

The record confirms that Plaintiff's counsel's manual review failed to accurately identify consent documented in ▮▮▮▮ records.  For example, Howard's Final Exhibit B includes the following five transmissions:[14]

---

[14] All tables in this brief were compiled using the exhibits cited.



(Howard 3rd Rep. Ex. B; Exs. 29-30 and 32-34, IQVIA007820, IQVIA003760, IQVIA115816, IQVIA142244, IQVIA136702.)  But the corresponding ███████ records for the HCPs associated with these ██████████ reveal that every single one had consented to receive a Fax at the time the Fax was sent, as shown in Table B.



(████████████████████.)  For example, ██████████ the HCP associated with Mebos ID 203761151, ████████████████████████████████████████. But because the ███ ████████████████████████████████████████ ████████████████████████████ Howard's automated analysis found no consent for this HCP.  Although Howard ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ (*See* Section II.D., *supra*.)  And as Plaintiff's counsel ██████████ ████████████████████████, these HCPs are erroneously listed in Howard's Exhibit B.

**Second**, Plaintiff's counsel did not ████████████████████████████████ ██████ (Oppenheim Decl. ¶¶ 19, 20), thereby erroneously ignoring consent evidence separate and apart from the ████████████████████.  (*See* Section II.C.3., *supra*.)  For instance, Howard's Final Exhibit B includes:



(Howard 3rd Rep. Ex. B; Exs. 40-42, 44-45, IQVIA0977475, IQVIA0975549, IQVIA0653217, IQVIA0653265, IQVIA0641319.)  But each of these fax numbers are associated with call notes in

productivity trackers that are dated prior to the Faxes and reflect "evidence of consent," even as defined by Plaintiff's counsel.  (Oppenheim Decl. ¶ 36; *see* Foster Tr. 138:25-139:12.)



(Ex. 38, IQVIA477164.)   Howard's analysis and Plaintiff's counsel's manual review fails to identify Faxes associated with documented consent in the productivity trackers.

      ***Third***, Plaintiff's counsel relied on a flawed OCR process to attempt to identify call notes in PDF documents for  (Oppenheim Decl. ¶ 19.)   As Plaintiff's counsel conceded, PDF documents are ██████████████████████████████ ██████████████████████████ (*Id*. ¶ 18; *see also* Howard 2nd Dep. 13:18-24 (████████ ████████████).)  Plaintiff's counsel do not state that they or Howard conducted any review of the PDFs to "correct" any OCR errors, ████████████████████████████ ██████████████████████████████████████ (Howard 1st Rep. ¶ 37.)  Nor would any manual correction process be feasible; ████████████████████ ██████████████████████████ (Oppenheim Decl. ¶ 35.)  As a result, Plaintiff's counsel's review based on the results of an ████████ OCR process was likewise imperfect and incomplete.

***Fourth***, even for Faxes that do not appear to have a clear record of documented consent, in light of IQVIA's standard policy of securing consent, and the possibility of human error in maintaining completely accurate call notes and entering them into ██████████ and myriad productivity trackers, individualized conversations with each HCP and each recruiter would be necessary to determine which HCPs (if any) did not give prior consent.  (*See* Section IV.A.1., *supra*.)  In particular, the call notes are not always easily deciphered.  For example, Howard's Final Exhibit B includes transmissions associated with the following entries from Oppenheim Exhibit 7:

██████████████████████████████████████████████████████

(Howard 3rd Rep. Ex. B; Oppenheim Ex. 7.) ████████████████████

██████████████████████████████████████████████████████

Further, even if every single call note *were* legible and complete, ████████████ ███████████████████████████████████████ (Deal 3rd Rep. ¶ 14.) ████████████ ████████████████████████████████████████████████████████ (*see* Howard 3rd Rep. ¶ 12c), there is a strong possibility that Howard failed to identify consent evidence for these Faxes because he could not match the appropriate call notes to the correct HCP. Thus, even a manual review of every single page of every single document in IQVIA's production (which should, by definition, preclude class certification) would not accurately isolate the HCPs (if any) for whom there is no documented consent to receive Faxes.

Moreover, even if there are HCPs for whom there is no documented evidence of consent in IQVIA's records, the fact remains that it was IQVIA's standard policy to obtain consent prior to attempting to send out Faxes. Documented consent is not required under the TCPA; verbal consent suffices. *See* 47 U.S.C. § 227(a)(5) ("prior express invitation or permission" can be provided "*in writing or otherwise*" (emphasis added)). As a result, to the extent that any HCP claims that they did not consent to receive a Fax, at a minimum, individualized conversations with each such HCP and the relevant IQVIA recruiter would be required to resolve this dispute.

### (iii)   Plaintiff's Counsel Misrepresents the Parameters of Their Manual Review.

Although IQVIA has not been able to fully replicate or test Plaintiff's counsel's review, IQVIA's initial review has identified a multitude of errors and inconsistencies in counsel's methodology and results.

*First*, the Oppenheim Declaration claims that Plaintiff's counsel construed ████████ ███████████████████████ According to counsel, ████████████████████ ████████████████████████████████████████████████████ (Oppenheim Decl. ¶ 36.) At the outset, ████████████████████████████████

████████████████████████████████████████████ (Foster Tr. 138:25-

139:12.)  (*See* Section II.4., *supra*.)  So there is nothing ████████████████████

███████ (Oppenheim Decl. ¶ 36.)  Regardless, Plaintiff's counsel's representation is wrong,

because Howard's Final Exhibit B includes many transmissions associated with a "Send Fax" note

prior to IQVIA's attempt to send the Fax, such as the following from Oppenheim Exhibit 7:



(Howard 3rd Rep. Ex. B; Oppenheim Ex. 7.)  These are all HCPs who consented before Faxes

were attempted to be sent, yet Plaintiff's counsel concluded that "no conversation" took place and

instructed Howard to include them in Howard's Final Exhibit B.  (Oppenheim Decl. Ex. 7.)

     ***Second***, the Oppenheim Declaration asserts that Plaintiff's counsel ███████████████

████████████████████████████████████████████████████████████████████████

(Oppenheim Decl. ¶ 36.)  But contrary to this representation, Howard's Final Exhibit B includes

records associated with the following Oppenheim Exhibit 7 records that clearly note PCS

participation before IQVIA's attempt to send a Fax, such as:

_____

¹⁵ ████████████████████████████████████████████████████████████████

██████████████████████████████████████ (Mateo Tr.

82:16-83:4, 87:21-88:5, 164:17-165:1; Francisco Tr. 111:24-112:7.)  (*See* Section II.C.4., *supra*.)



(Howard 3rd Rep. Ex. B; Oppenheim Ex. 7.)   These HCPs, too, were erroneously listed in Howard's Final Exhibit B despite Plaintiff's counsel's "manual review."

  ***Third***, Plaintiff's counsel wrongly assumed that all call notes "█████████████████ █████████████████████████ (Oppenheim Decl. ¶ 24.)  But Howard's Final Exhibit B includes records such associated with the following from Oppenheim Exhibit 7:



(Oppenheim Ex. 7.) ███████████████████████████████████

(Oppenheim Decl. Ex. 4 at IQVIA476555), these examples do not end with initials, potentially due to human error or some other unintentional issue.  Plaintiff's counsel's representation that,

███████████████████████████████████████████████

███████████████████████████████████████ (Oppenheim Decl. ¶¶

24, 35.)  This underscores the deficiencies in the review:  it is not possible to determine which

HCPs did not consent to receive Faxes without individualized conversations with each of them

and each relevant recruiter.

Overall, these sample records demonstrate that Plaintiff's counsel's manual review was

untimely disclosed, subjective, misleadingly described in the Oppenheim Declaration, inaccurate,

and incomplete.  As a result, Plaintiff's class definition—which depends on its results—cannot

possibly offer "a reliable and administratively feasible mechanism" for ascertaining class

members.  *Byrd*, 784 F.3d at 163 (citation omitted).

### 2. Plaintiff Cannot Ascertain Which Putative Class Members Received a Fax on a Telephone Facsimile Machine.

For the same reasons that Plaintiff fails to show that "common questions" predominate as

to which HCPs received a Fax on a "telephone facsimile machine," Plaintiff also fails to show that

there is "a reliable and administratively feasible mechanism" for determining whether putative

class members received a Fax on equipment covered by the TCPA.  *Byrd*, 784 F.3d at 163 (citation

omitted).  It is undisputed that there is ***no evidence***, classwide or otherwise, that shows the type of

equipment on which HCPs received a Fax.  (*See* Section II.F., *supra*.)  Without such evidence, the

only way to determine which HCPs received Faxes through an online fax service is through

"extensive and individualized fact-finding."  *Marcus*, 687 F.3d at 593.

### 3. Plaintiff Impermissibly Proposes a Failsafe Class.

Class certification should be denied on the additional ground that Plaintiff impermissibly

seeks to certify a "fail-safe class," which is "defined so that whether a person qualifies as a member

depends on whether the person has a valid claim." *Zarichny v. Complete Payment Recovery Servs.,*

*Inc.*, 80 F. Supp. 3d 610, 623 (E.D. Pa. 2015) (citation omitted).  Here, Plaintiff's proposed class definition excludes any HCPs who registered or participated in the NDTI or CD, and any HCPs for whom IQVIA "has produced [] evidence of consent to be sent" the Fax.  (Mot. at 1.)  Plaintiff's circular class definition attempts to include only putative class members with an allegedly viable TCPA claim, and improperly depends upon the resolution of disputed facts related to the evidence of consent in the record.

In *Zarichny*, the plaintiff sought to represent (i) a "class of people 'who received one or more telephone calls from defendants to whom defendants did not send a written notice'" and (ii) those "'who received one or more telephone calls from defendants on the individual's cellular telephone that was initiated using an automatic telephone dialing system' without prior consent." *Zarichny*, 80 F. Supp. 3d at 623.  The court struck both class definitions on the ground that they "create[d] impermissible fail-safe classes" that "fail[ed] to satisfy the ascertainability requirement." *Id.* at 624, 625 (citation omitted).  It noted that "[a]scertainability . . . eliminates administrative burdens that are 'incongruous with the efficiencies expected in a class action', protects absent class members by facilitating notice, and protects defendants 'by ensuring that those persons who will be bound by the final judgment are clearly identifiable.'" *Id.* at 625 (citation omitted).  The court accordingly held that there was "no way to provide notice to [the] [] class without the sort of extensive fact-finding that class actions should avoid." *Id.* at 625-26.

Here, Plaintiff's counsel have gone one step further and have purported to engage in precisely "the sort of extensive fact-finding" that defeats class certification. *Id.*  (*See* Oppenheim Decl.)  Counsel's attempt to cherry-pick members of the putative class pursuant to his own subjective parameters exacerbates Plaintiff's gerrymandered class definition, and requires denial of class certification. *See Butela v. Midland Credit Mgmt. Inc.*, 341 F.R.D. 581, 603 (W.D. Pa.

2022) ("Courts have also denied certification of fail-safe classes on ascertainability grounds, reasoning that 'the inquiry into class membership would require holding countless hearings resembling 'mini-trials.'" (citation omitted)).

### C.     Plaintiff Is Not an Adequate or Typical Class Representative.

Plaintiff is not an adequate or typical class representative because he "is subject to unique defenses that are "likely to become a major focus of the litigation" in two ways. *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006) ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense . . . ."); *accord Utesch v. Lannett Co.*, No. 16-5932, 2021 WL 3560949, at *5 (E.D. Pa. Aug. 12, 2021), *aff'd sub nom. Univ. of P.R. Ret. Sys. v. Lannett Co.*, No. 21-3150, 2023 WL 2985120 (3d Cir. Apr. 18, 2023).

*First*, Plaintiff cannot establish that his claim is typical because he fails to show that he received the Faxes on a "telephone facsimile machine" by transmission over a "regular telephone line."  47 U.S.C. §§ 227(a)(3), 227(b)(1)(C).  ████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████  (*See* Section II.G., *supra*.)  Thus, IQVIA intends to argue that Plaintiff cannot meet his burden of showing that his equipment qualifies as a "telephone facsimile machine," which would render his claim atypical of the proposed class.  *See Utesch*, 2021 WL 3560949, at *5.

*Second*, Plaintiff did not suffer the harms the TCPA was enacted to prevent.  *Cmty. Vocational Schs. of Pittsburgh*, 307 F. Supp. 3d at 414 ("In enacting the TCPA, Congress intended to remedy [i] the telemarketer's attempts to 'shift[ ] some of the costs of advertising from the sender to the recipient' like ink and paper and [ii] the telemarketer 'occup[ying] the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.'" (citation omitted)).  ████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████   (*See* Section

II.G., *supra*.)   Plaintiff thus did not suffer any cognizable "harms" resulting from the Faxes.

Plaintiff's consequent lack of standing to bring his TCPA claim further renders him an atypical

plaintiff.   *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204, 2208 (2021) (holding that

plaintiffs, "class action or not," must prove standing by demonstrating a harm that is "sufficiently

concrete to qualify as an injury in fact" (citation omitted)); *Barclift v. Keystone Credit Servs., LLC*,

585 F. Supp. 3d 748, 753-54 (E.D. Pa. 2022) ("bare procedural violations of a federal statute are

not enough on their own to establish standing").

### D.    Plaintiff's Counsel Are Not Adequate Class Counsel.

Plaintiff's counsel are not adequate to serve as class counsel because the manual review

that they performed improperly interjects Plaintiff's counsel, Oppenheim, as a fact witness.

Under Pennsylvania Rule of Professional Conduct 3.7, which implements the American

Bar Association's ("ABA") Model Rule 3.7(a), "[a] lawyer shall not act as advocate at a trial in

which the lawyer is likely to be a necessary witness."  Here, IQVIA will have no choice but to call

Oppenheim as a fact witness at trial, because only he can testify to the manual review that he

personally performed.  *See Carta ex rel. Est. of Carta v. Lumbermens Mut. Cas. Co.*, 419 F. Supp.

2d 23, 29 (D. Mass. 2006) ("A lawyer is likely to be a necessary witness where the proposed

testimony is relevant, material, not merely cumulative, and unobtainable elsewhere." (citation

omitted)).[16]  This renders him, and his firm, inadequate as class counsel.

In *Irvin E. Schermer Trust v. Sun Equities Corp.*, the plaintiff trust tendered certain

company shares pursuant to an "offer" from the defendants, and brought a shareholder class action.

116 F.R.D. 332, 334 (D. Minn. 1987).  Class counsel was the trustee of the plaintiff trust at the

---

[16] Massachusetts has also implemented ABA Model Rule 3.7.

time of the tender. *Id*. at 338. Defendants argued that he would "be an essential witness at trial" because his testimony would be "essential to establish that the Trust could not have tendered the shares in *justifiable* reliance on the defendants' alleged fraud." *Id*. Citing to Minnesota Rule of Professional Conduct 3.7, which also implements ABA Rule 3.7, the Court agreed. It held: "As the only person with the legal authority to make the decision to tender the [] shares, [class counsel]'s testimony . . . is an essential element of the defense. Thus, the likelihood that he will have to withdraw as counsel due to the necessity of his testimony ***precludes him from adequately representing the proposed class as class counsel*.**" *Irvin*, 116 F.R.D. at 338 (emphasis added). The Court accordingly declined to certify the class. *Id*. at 339; *see also Jarzyna v. Home Props., L.P.*, 201 F. Supp. 3d 650, 662 (E.D. Pa. 2016) (striking attorney affidavit where attorney was "attempting to take on the dual roles of expert witness and advocate").

The Court should do the same here. Oppenheim performed a manual review of DSS Comment History that purported to identify putative class members who did not consent to receive Faxes. (*See* Section II.E., *supra*.) His testimony is therefore central to the disposition of this case.[17] The Court should find class counsel inadequate, and deny certification.[18]

---

[17] Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ (Howard 2nd Depo. 43:7-19, 43:23-44:6, 44:11-15, 122:3-123:7, 123:17-25.)

[18] Plaintiff also fails to satisfy the standard for numerosity, because he cannot show that any of the Faxes were successfully received by the HCP recipients. *Hargrove*, 974 F.3d at 469 n.1. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
(Foster Tr. 308:15-18; Francisco Tr. 179:2-15.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Foster
Tr. 307:1-19.). Coombs also testified that the "Fax Sent Successfully" notation means that XMedius "received all the relevant receipt tokens from the remote machine," but "*[w]hat has happened to it at the other end from that point, we don't know*." (Coombs Tr. 53:15-23 (emphasis added).) As a result, Plaintiff cannot rely on the fax notification emails to show numerosity. *Wendell H. Stone Co. v. PC Shield Inc.*, No. 18cv1135, 2018 WL 6065408, at *2 (W.D. Pa. Nov. 19, 2018) ("the numerosity requirement has been given 'real teeth'" and "demands that a court

### E.    Plaintiff Fails to Establish Superiority.

Plaintiff fails to satisfy superiority for two reasons.  First, "a class action is not a superior vehicle" for this dispute because individualized inquiries are necessary to determine whether HCPs gave prior consent, and whether HCPs received a Fax on a "telephone facsimile machine."  (*See* Sections IV.A., *supra*.)  *See Katz*, 340 F.R.D. at 388 ("The Court holds that neither predominance nor superiority is met because of the individualized factual questions of (1) whether each class member ***consented*** to receive the fax . . . and (2) whether each class member received the fax on a standalone fax machine or an ***online fax service***." (emphasis added)).  Here, as in *Katz*, "any common answer to [these] questions is indeterminate at any stage." *Id.* at 390.

Second, a class action is not superior if an ultimate classwide judgment is so disproportionate to any actual damages suffered that it would violate defendant's due process rights.  In *Wakefield v. ViSalus, Inc.*, the jury returned a verdict against the defendant, "finding that it sent 1,850,440 prerecorded calls in violation of the TCPA," and awarding $925,220,000 in statutory damages.  51 F.4th 1109, 1113 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1756 (2023).  On appeal, the Ninth Circuit noted that "constitutional due process concerns are heightened where, as here, statutory damages are awarded as a matter of strict liability when plaintiffs are ***unable to quantify any actual damages they have suffered***," and that "in the mass communications class action context, vast cumulative damages can be easily incurred, because modern technology . . . triggers minimum statutory damages with the push of a button." *Id.* at 1120, 1124-25 (emphasis added).  The Ninth Circuit "conclude[d] that the aggregated statutory damages . . . [were] subject to constitutional limitation in extreme situations—that is, when they are "'wholly disproportioned' and 'obviously unreasonable' in relation to the goals of the statute and the conduct the statute

---

'make a factual determination, based on the preponderance of the evidence'" that Rule 23 has been satisfied (citations omitted)).

prohibits." *Id.* at 1123 (quoting *St. Louis, I. M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 67 (1919). Here, Plaintiff seeks to certify a nationwide class that allegedly received 48,175 Faxes, and seeks damages of up to $1,500 per fax (if Plaintiff can establish knowing or willful violations, which he cannot.  (*See* Mot. at 16.)  *See* 47 U.S.C. § 227(b)(3).  Plaintiff seeks recovery even though he suffered no damages, ███████████████████████████████████. (*See* Section II.G., *supra*.)  Any statutory damages are therefore unlikely to be upheld.  *Wakefield*, 51 F.4th at 1123.

Here, given that Plaintiff's requested class relief would violate IQVIA's due process rights, and given the numerous individualized inquiries necessary to determine which HCPs have a TCPA claim, a class action is not a superior vehicle.  *See Hawk Valley, Inc. v. Taylor*, 301 F.R.D. 169, 175 (E.D. Pa. 2014) ("[A] class may not be certified unless the court finds . . . that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.").

## V.   CONCLUSION

For the above reasons, this Court should deny Plaintiff's Motion for Class Certification.

Dated:  April 26, 2024

By:     /s/ Tiffany Cheung
        TIFFANY CHEUNG

TIFFANY CHEUNG (admitted *pro hac vice*)
BONNIE LAU (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone: (415) 268-7000
Email: TCheung@mofo.com
Email: BLau@mofo.com

JOE NGUYEN (93638)
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street
Suite 2600
Philadelphia, PA 19103
Telephone: (215) 564-8000
Email: JNguyen@stradley.com

EDWARD EBERSPACHER (admitted *pro hac vice*)
MEYER LAW GROUP, LLC
30 North LaSalle Street
Suite 1410
Chicago, IL 60602
Telephone: (312) 265-0565
Email: TEberspacher@meyerlex.com

*Attorneys for Defendant IQVIA Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Tiffany Cheung, hereby certify that on April 26, 2024, the foregoing document was filed electronically with the Clerk of the Court using the ECF system.  This document is available for reviewing and downloading from the ECF system.


Dated:  April 26, 2024          By:     */s/ Tiffany Cheung*          
                                          TIFFANY CHEUNG