# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD E. FISCHBEIN, M.D.,** Individually and as the Representative of a Class of Similarly Situated Persons, | : : : : | **CIVIL ACTION** <br><br> **NO. 19-5365** |
| *Plaintiff* | : : | |
| v. | : : | |
| **IQVIA, INC.** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                             JUNE 5, 2025

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Richard E. Fischbein, M.D. ("Plaintiff") filed this class action against Defendant IQVIA, Inc. ("Defendant"), asserting that Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(C), when sending Plaintiff and other purportedly similarly situated healthcare provider class members unsolicited fax advertisements without prior express invitation or permission. Before this Court are Plaintiff's motion for class certification filed pursuant to Federal Rule of Civil Procedure ("Rule") 23, (ECF 87, 89), and Defendant's response, (ECF 92, 95). The motion for class certification is now ripe for disposition. For the reasons set forth, the motion for class certification is denied.

**BACKGROUND**

The Telephone Consumer Protection Act (the "TCPA") provides that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement . . . ." 47 U.S.C. §

227(b)(1)(C). Under the TCPA, an "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* at § 227(a)(5).

Here, Plaintiff asserts that Defendant violated the TCPA by faxing mass advertisements to Plaintiff and a class of purportedly more than 25,000 healthcare providers without obtaining prior express invitation or permission. The facts relevant to class certification are summarized as follows:[1]

> Defendant is a research organization that provides services, such as clinical trial monitoring and data management, to clients in the health information industry. Defendant's business includes the collection of human health data for clients and to augment its own commercial databases. Defendant obtains its data by, *inter alia*, sending faxes to medical providers encouraging them to share information about their patients and treatment practices.
>
> Plaintiff is a physician who received at least two such faxes from Defendant. The faxes were substantially similar, inviting Plaintiff to participate in a "nationally recognized, HIPAA-compliant" study by submitting patient information to Defendant online, on an ongoing basis. The faxes indicated that, in return for any patient data Plaintiff submitted, he would receive "points" "toward purchase of a wide variety of gifts from [Defendant's] on-line catalog," which included items such as third-party gift cards, event tickets, and merchandise. Prior to receiving the faxes, Plaintiff had no business relationship with Defendant and did not request or consent to receive the faxes.

Plaintiff alleges that Defendant sent the same or similar faxes to thousands of other healthcare providers in violation of the TCPA. Based on these allegations, Plaintiff moves to certify the purported class defined as:

> All persons: (1) who were sent one or more facsimiles between September 29, 2016 and August 28, 2018, inviting them to participate in Impact Network's "National Healthcare Census" in exchange for monetary payment; (2) who did not participate in and had never participated in the "National Healthcare Census" survey;

---

[1] The facts are derived from the parties' statements of facts, briefs, and the exhibits attached thereto.

>    and (3) as to whom Defendant has not produced evidence showing
>    SK&A verified the person's fax number.

(Pl's. Mot., ECF 118, at p. 20).

**LEGAL STANDARD**

Rule 23 governs the certification of class actions in federal court. A plaintiff seeking class certification must satisfy all four requirements of Rule 23(a). *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). These elements are: (1) numerosity — the class is so numerous that joinder of all members is impracticable; (2) commonality — there are questions of law or fact common to the class; (3) typicality — the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) adequate representation — the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see also Marcus*, 687 F.3d at 590–91. In addition, a class action plaintiff must also satisfy at least one of the three elements of Rule 23(b)(1), (2), or (3). Fed. R. Civ. P. 23(a)–(b); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011); *Marcus*, 687 F.3d at 590.

Here, Plaintiff proposes his class under Rule 23(b)(3). This Rule permits certification when the court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In other words, Rule 23(b)(3) requires both "predominance" and "superiority."

The United States Court of Appeals for the Third Circuit (the "Third Circuit") has held that Rule 23(b)(3) also requires that the proposed class be "currently and readily ascertainable based on objective criteria." *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129–30 (3d Cir. 2023). Ascertainability is "an essential prerequisite of a class action, at least with respect to actions under

Rule 23(b)(3)." *Marcus*, 687 F.3d at 592–93.  As such, "[a] plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).  The ascertainability requirement is a "threshold issue" and serves several objectives, including "insisting on the easy identification of class members" and "protect[ing] defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Marcus*, 687 F.3d at 593.  "Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013).  A "petition for class certification will founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013).  Therefore, a trial court should ensure that class members can be identified "without extensive and individualized fact-finding or 'mini-trials.'" *Marcus*, 687 F.3d at 593.

The party seeking class certification carries the burden as to all elements, and the Court must conduct "a 'rigorous analysis' of the evidence and arguments put forth." *Marcus*, 687 F.3d at 591.  The Court may be required to resolve factual or legal disputes relevant to class certification, and factual determinations must be made by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).

**DISCUSSION**

As noted, Plaintiff seeks certification of the following class pursuant to Rules 23(a) and 23(b)(3):

> All persons: (1) who were sent one or more facsimiles between November 16, 2015, and January 10, 2019, inviting a healthcare professional to register or participate in the National Disease and Therapeutic Index or Channel Dynamics survey in exchange for

4

> points to be redeemed for rewards; (2) who never registered or participated in either survey; (3) for whom Defendant has produced no evidence of consent to be sent the invitation by facsimile transmission; and (4) who are listed in Exhibit B to the "(Supplemental Sur-Rebuttal) Expert Report of Lee Howard" dated February 8, 2024.

Defendant argues that Plaintiff's proposed class is not ascertainable and that common issues of fact and/or law do not predominate over individual plaintiff inquiries. Each of these arguments is addressed below.

### I.   *Ascertainability of Class Members*

"[A]s an essential prerequisite to class certification, [a] plaintiff must show by a preponderance of the evidence that the class is ascertainable." *Hayes*, 725 F.3d at 354 (internal quotation marks and citations omitted); *see also Byrd*, 784 F.3d at 165 (explaining that the ascertainability "inquiry . . . is independent from the other requirements of Rule 23"). "Ascertainability functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23. In other words, the independent ascertainability inquiry ensures that a proposed class will actually function as a class." *Byrd*, 784 F.3d at 162. "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 163 (internal quotation marks and citations omitted).

Defendant argues that the proposed class is not ascertainable because, *inter alia*, there is no reliable and administratively feasible mechanism for determining whether putative class members received the faxes at issue on traditional, stand-alone fax machines, arguably the only type of devices falling within the protection of the TCPA, as opposed to online fax services. In response, Plaintiff argues that Defendant's challenge is misplaced because the TCPA protects

5

faxes received on either stand-alone fax machines or online fax services. To determine ascertainability, therefore, this Court must first determine whether the TCPA's protection is limited to faxes received on stand-alone fax machines or extends to faxes received by way of online fax services.

Though the Third Circuit has not addressed this issue, several courts outside this circuit have. Notably, each has found that the TCPA does not extend its protection to those who receive unsolicited faxes by way of an online fax service rather than on a stand-alone fax machine. *See Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 91 F.4th 202, 211 (4th Cir. 2024); *Astro Cos., LLC v. WestFax Inc.*, 2025 WL 474931, at *4 (D. Col. Feb. 12, 2025); *Scoma Chiropractic, P.A. v. Nat'l Spine and Pain Centers, LLC*, 2022 WL 16695130, at *8-9 (M.D. Fl. Nov. 3, 2022); *True Health Chiropractic, Inc. v. McKesson Corp.*, 2023 WL 7015279, at *2 (9th Cir. 2023). This Court finds these decisions persuasive, particularly that of the United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") in *Career Counseling, Inc.*, 91 F.4th 202.

In *Career Counseling*, the plaintiff similarly sought certification of a class of plaintiffs who received a particular unsolicited fax advertisement. *Id.* at 206. The defendants, like Defendant in the case *sub judice*, argued that the proposed class was not ascertainable because the TCPA only extended its protection to those who received the advertisements on stand-alone fax machines — not online fax services — and ascertaining the class would first require determining on an individual plaintiff basis whether a class member received the advertisement on a stand-alone fax machine. *Id.* at 206-08. Both the district court and Fourth Circuit agreed with defendants, opining that the TCPA only extended protection to plaintiffs who received the advertisement on stand-alone fax machines, not online fax services. *Id.* at 207, 209. In reaching its decision, the Fourth Circuit found that the plain statutory language of the TCPA prohibited ***only*** the sending of

6

unsolicited advertisements to stand-alone fax machines. *Id.* at 209. This Court agrees with the Fourth Circuit's analysis and conclusion and adopts them here.

"It is well established that 'when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citation omitted); *see also Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011) ("If the statute's plain language is unambiguous and expresses [Congress's] intent with sufficient precision, [the Court] need not look further."). "[E]very exercise of statutory interpretation begins with an examination of the plain language of the statute," and "[w]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009) (citations omitted). In addition, a "cardinal rule of statutory interpretation is that courts should avoid interpreting a statute in ways that would render certain language superfluous." *United States v. Williams*, 917 F.3d 195, 202 (3d Cir. 2019). Here, the Court must "look first to [the statute's] language, giving the words used their ordinary meaning." *Panzarella v. Navient Sols., Inc.*, 37 F.4th 867, 872 (3d Cir. 2022). When interpreting an undefined term, a court must "determine its plain meaning at the time of the TCPA's enactment." *Id.*

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, ***to a telephone facsimile machine***, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C) (emphasis added). The plain language of this provision clearly distinguishes between the equipment used to send the advertisement and that used to receive the advertisement. Sending equipment is broad and includes "any telephone facsimile machine, computer, or other device." *Id.* In contrast, the only receiving equipment covered by the TCPA is a "telephone facsimile machine." *Id.* "Where Congress includes particular language in one section of a statute but omits

7

it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Riccio v. Sentry Credit, Inc.*, 954 F.3d 582, 587–88 (3d Cir. 2020) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). The intentional omission of "computer or other device" from the identification of receiving equipment makes clear that not all equipment qualifies as a "telephone facsimile machine." Thus, to fall within the TCPA's prohibition, a fax can be sent from a "telephone facsimile machine, computer, or other device," but it must be received in only one way: on a "telephone facsimile machine." *Id.*

The TCPA defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe text or images, or both, ***from paper*** into an electronic signal and to transmit that signal over a ***regular telephone line***, or (B) to transcribe text or images (or both) from an electronic signal received over a ***regular telephone line onto paper***." *Id.* at § 227(a)(3) (emphasis added). As such, to qualify as a "telephone facsimile machine" under the TCPA, the receiving equipment must (1) receive the fax transmission over a "regular telephone line," and (2) have the capacity to print the fax "onto paper." *Id.* Defendant argues that online fax services (unlike traditional, stand-alone fax machines) have neither the capacity to transmit electronic signals over a "regular telephone line" — which Defendant interprets to mean an ordinary analog telephone line — nor the capacity to transcribe text or images from or onto paper.

To support its interpretation of "regular telephone line" as reaching beyond that of an ordinary analog telephone line, Plaintiff relies on the opinion of Christopher Lee Howard, Plaintiff's proffered expert. Mr. Howard opines that "regular telephone line" includes any telephone line, including those using Voice Over Internet Protocol ("VoIP") and high bandwidth trunks (*i.e.*, T1), so long as the line is regulated by the North American Numbering Plan Administrator ("NANPA"). According to Mr. Howard, NANPA governs all ten-digit telephone

numbers that place and receive calls on the Public Switched Telephone Network ("PSTN"), and *any* fax sent on the PSTN from one NANPA ten-digit number to another NANPA ten-digit number is a fax sent on a "regular telephone line," including faxes sent over VoIP and T1 trunk lines.

Mr. Howard's suggested interpretation that all fax receiving equipment uses a "regular telephone line" would render superfluous the inclusion of the word "regular" in the statute to modify "telephone line." Mr. Howard's failure to distinguish among any of the various lines connected to the PSTN would improperly interpret the statute to encompass *any* telephone line, thereby, giving no effect to the term "regular" in the statutory phrase "regular telephone line." Moreover, Mr. Howard's broad interpretation of "regular telephone line" is belied by his own testimony and industry experience. Indeed, Mr. Howard conceded that in the telecommunication industry, the term "regular telephone line" means the same thing as "analog telephone line." Specifically, Mr. Howard testified as follows:

> Q. It's interesting, your answer there. At one point you inserted the word "analog telephone line," and at the very end you used the word "individual line" at the end of your answer. But what the patent says is "regular telephone line;" correct?
>
> A. The author appears to be using regular telephone line to mean the same thing as analog telephone line. It happens quite a bit.
>
> Q. Using, in the industry, analog line and regular telephone line interchangeably, that's what you're referring to happens in the industry quite a bit?
>
> A. It happens colloquially when somebody wants to say and not be technical.
>
> Q. And you mentioned earlier that it's your understanding that the use of regular, for purposes of describing a regular telephone line in the statutory definition, is a colloquial term. You've said that a couple times today; correct?
>
> A. I believe it is.

(Howard Dep. Tr., ECF 97-9, at 207:12-208:7). Mr. Howard also acknowledged an inability to identify any relevant patent or other documentation that referred to either a T1 trunk line or VoIP interchangeably with a "regular telephone line." (*Id.* at 213:18-214:9). To the contrary, each of the patents offered during Mr. Howard's deposition distinguished between "regular telephone line" and a T1 trunk line. (*Id.*) Importantly, neither Plaintiff nor his proffered expert offered any support from technical literature or industry practice to equate a "regular telephone line" to either a T1 trunk line or VoIP line. Moreover, the Federal Communications Commission ("FCC") describes VoIP as "a technology that allows you to make voice calls using a broadband Internet connection ***instead of a regular (or analog) phone line***." https://www.fcc.gov/general/voice-over-internet-protocol-voip (emphasis added). In the absence of any supporting evidence or argument to the contrary, and in light of Plaintiff's own expert testimony, this Court finds that the plain meaning of the statutory use of "regular telephone line" refers to an analog telephone line and does not include either VoIP or T1 trunk lines.

Notably, Plaintiff presents no evidence and makes no argument that an online fax service has the ability ***on its own*** to either transcribe text or images "from paper" or "onto paper." (Emphasis added.) Instead, Plaintiff's expert, Mr. Howard, merely opines that online fax services have the "capacity" to do these things as a "component" when connected to other devices, such as a scanner or printer. He testified:

> Q.    It's your opinion that every piece of equipment in the world that can handle image data has the capacity to transcribe that data onto paper, true?
>
> A.    I don't believe that I know of any equipment that does have the capacity – or that does handle image data that does not have the capacity to be a component to transcribe that to paper, correct.

(Howard Dep. Tr., ECF 97-8, 261:17-23).

This Court finds Plaintiff's suggested interpretation stretches the plain meaning of the statute. Such broad interpretation would render the capacity to print requirement superfluous by ignoring the statutory distinction between the *sending equipment* (which includes telephone facsimile machines, computer, and other devices) and the *receiving equipment* (which is distinctively limited to telephone facsimile machines). Consistent with the numerous other judicial opinions, the plain meaning of the TCPA's definition of "telephone facsimile machine" contemplates a stand-alone piece of equipment that has the capacity, on its own, to either transcribe text or images "from paper" or "onto paper." Plaintiff has not shown the ability of an online fax server to do either.[2] As such, this Court finds that the plain language of the TCPA protects only those who receive unsolicited advertisements on a stand-alone fax machine, which, unlike online fax services, has the built-in capacity to print onto paper. *See Career Counseling, Inc.*, 91 F.4th at 211 (holding that online fax service does not qualify as a "telephone facsimile machine" under plain statutory language of TCPA); *Astro Cos., LLC*, 2025 WL 474931, at *4 (holding that TCPA does not apply to online fax services); *Scoma Chiropractic, P.A.*, 2022 WL 16695130, at *8-9 (holding that the TCPA does not extend protection to the receipt of unsolicited faxes on an online fax service); *True Health Chiropractic, Inc.*, 2023 WL 7015279, at *2 (affirming district court's holding that the TCPA did not apply to faxes received through an online fax service).

Although this Court relies only on the statutory language of the TCPA for its analysis, its conclusions are supported by the Federal Communications Commission's ("FCC") declaratory

---

[2] Plaintiff's expert, Mr. Howard, testified that in his "30-plus years in [the] business of fax technology, owning and running an online fax service business," he "never heard of anyone wanting an online fax service provider to print their faxes for them," and never heard of an online fax service provider automatically printing faxes." (Howard Dep. Tr., ECF 97-9, 226:9-16). Mr. Howard testified further that "[i]t certainly doesn't make sense" to him that someone would ask their online fax service to print the faxes. (*Id.* at 227:15-18).

11

ruling in *In the Matter of Amerifactors Fin. Grp., LLC*, 34 F.C.C. Rcd. 11950 (2019), which this Court also finds instructive and persuasive.³ In *Amerifactors*, the FCC noted that the TCPA only proscribed sending a fax to "telephone facsimile machines" and explained that "a fax received by an online fax service as an electronic message is effectively an email." *Id*. The FCC observed that with online fax services, "[c]onsumers can manage those messages the same way they manage email by blocking senders or deleting incoming messages without printing them." *Id*. at 11953. The FCC ultimately concluded that given the nature of online fax services, faxes sent to these services did not "cause the specific harms to consumers Congress sought to address in the TCPA." *Id*.; *see also In the Matter of Joseph T. Ryerson & Son, Inc. Petition for Declaratory Ruling Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 35 F.C.C. Rcd. 9474 (2020) (rejecting the argument that online fax transmissions "are TCPA-covered faxes because they [are] eventually sent to a computer that could print the message," and reasoning that "[v]irtually all email could be accessed by computers with printing capabilities; yet emails do not implicate the consumer harms that are the TCPA's target, *such as automatic printing*.") (emphasis added).

In addition, the 1991 Report of the House Committee on Energy and Commerce — recommending the TCPA's enactment — explained that the "[f]acsimile machines [of the time were] designed to accept, process, and print ***all*** messages which arrive over their dedicated lines." H.R. REP. 102-317, 10 (1991) (emphasis added). Given the automatic nature of these fax machines, sending unsolicited faxes was deemed problematic because (1) "it shifts some of the

---

³ "[C]ourts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance' consistent with the APA. And interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

12

costs of advertising [including ink and paper costs] from the sender to the recipient;" and (2) "it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." *Id*. at 10. The same concerns do not exist with online fax services because the recipients can choose whether and when to print faxes. These undisputed distinctions also support this Court's plain meaning statutory interpretation of "telephone facsimile machines" to include only traditional, stand-alone fax machines.

In sum, this Court finds that the plain language of the TCPA only provides protection to those who receive unsolicited advertisements on a traditional, stand-alone fax machine. Consequently, class membership in this case must be limited to stand-alone fax machine users. Because the receipt of the unsolicited fax advertisement on a "telephone facsimile machine" is a required element of a TCPA claim, Plaintiff must demonstrate that this element can be determined or ascertained by common evidence at class certification. Plaintiff's expert, however, concedes that no such class evidence exists when he testified:

> Q. Is there a reliable method in this case based on what you have seen to determine what equipment is being used to receive the fax, the attempted faxes at issue in this case?
>
> A. Not consistently, no.
>
> Q. You can't tell me, for instance, as you sit here right now how many people received the faxes at issue in this case, to the extent they did, via an email attachment on their computer or iPhone, can you?
>
> A. No.
>
> Q. You can't tell me as you sit here today how many of the attempted fax recipients at issue in this case received their fax via an online fax service provider, can you?
>
> A. I do not know.

13

> Q. And the only way we would be able to tell that would be this individualized inquiry of contacting each and every intended fax recipient to get more information about their receiving equipment, true?
>
> A. I don't know. There may be ways of querying the ownership of the subscribed telephone numbers from the common carriers, et cetera, to acquire that information.
>
> Q. Are you aware of any attempt by counsel for the plaintiff to acquire that information from common call carriers in this case?
>
> A. I'm not aware of any.
>
> Q. So other than that, since you're not aware of that happening, are you able to tell, for instance, from looking at the email notifications whether those intended fax recipients received those faxes via an online fax service provider?
>
> A. There will be some that you can tell, but you can't consistently tell. We know in Fischbein's case, it was not. So there are some – certainly evidence in there that where you might be able to tell when it was and when it wasn't. But it's not going to be every single fax transmission you can tell one way or the other.
>
> Q. No reliable way to do it other than that individualized inquiry, true?
>
> A. Again, I think you could probably query common carriers and things like that to acquire ownership of the line and then, you know, query how was it serviced.
>
> Q. But that hasn't been done here, right?
>
> A. Not to my knowledge.
>
> Q. Since that hasn't been done, the only other way that you are aware of would be the individualized inquiry asking each intended recipient whether they received the fax via online fax service provider or not, true?
>
> A. That is one way. I can't think of any other way.

(Howard Dep. Tr., ECF 97-8, 268:2-270:6). In light of this testimony, and the absence of any other relevant class evidence, this Court finds that the only way to determine which health care

14

providers received faxes by way of a traditional, stand-alone fax machine is through "extensive and individualized fact-finding." *Marcus*, 687 F.3d at 593.

Despite these concessions, Plaintiff suggests that the class can be ascertained by some process of "class notice and declarations after resolution of the class's claims." (Pl. Reply, ECF 108, at p. 15). Notably, Plaintiff provides no explanation or description of any process to be used to identify such class members. Instead, Plaintiff seems to simply suggest that this process will involve and rely exclusively on "declarations" of potential class members. Plaintiff's suggestion is unpersuasive. As the Third Circuit held in *City Select Auto Sales, Inc. v. BMW Bank of North America Inc.*, 867 F.3d 434 (3d Cir. 2017), the only Third Circuit case cited by Plaintiff, "[a]ffidavits from potential class members, standing alone, without 'records to identify class members or a method to weed out unreliable affidavits,' will not constitute a reliable and administratively feasible means of determining class membership." *Id.* at 441 (citation omitted). The same is true here. Plaintiff identifies no mechanism or class evidence that in combination with the suggested declarations or affidavits constitute a "reliable and administratively feasible mechanism for determining" the type of equipment used by the prospective class plaintiff to receive the faxes at issue. As such, Plaintiff has not met his burden as to the requirement of ascertainability.

## II.   *Predominance*

Because Plaintiff's shortcomings with respect to ascertainability overlap with the requirement of predominance, this Court will also address predominance.[4] Having found that

---

[4] Because Plaintiff has failed to satisfy the threshold requirement of ascertainability, this Court need not and declines to address whether Plaintiff's proposed class meets the Rule 23(a) requirements. *See Jarzyna v. Home Props, L.P.*, 321 F.R.D. 237, 244 (E.D. Pa. 2017) ("Given that [p]laintiff cannot meet the threshold requirement for class certification by showing that his proposed class is ascertainable . . . the [c]ourt need not proceed to analyze other class certification requirement under Rule 23 . . . ."); *Stewart v.*

Plaintiff has failed to meet his burden with respect to ascertainability, this Court finds, for similar reasons, that Plaintiff has failed to satisfy Rule 23(b)'s predominance requirement.  Under Rule 23(b), this Court must determine whether "the questions of law or fact common to class members predominate over any questions affecting only individual members . . . ." Fed. R. Civ. P. 23(b)(3).

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Issues common to the class must "predominate" over individual issues. *In re Prudential Ins. Co. Am. Sales Prac. Litig.*, 148 F.3d 283, 313–14 (3d Cir. 1998).  "Because the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,' 'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). Plaintiff bears the burden to establish, by a preponderance of the evidence, that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016), and that his "claims are capable of common proof at trial" *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).  In other words, to establish predominance, Plaintiff must show by a preponderance of the evidence that the elements of his claim can be proven by evidence common to all in the class. *In re Hydrogen*

---

*Beam Glob. Spirits & Wine*, Inc., 2014 WL 2920806, at *14 (D.N.J. June 27, 2014) (explaining that even though defendants "challenge[d] [p]laintiffs' ability to satisfy . . . requirements of Rule 23(a)" as well as predominance and superiority under Rule 23(b), the court "need not address these issues at this time in light of its finding that the proposed [c]lasses [were] not ascertainable, given that ascertainability of the class is a threshold issue the [c]ourt must address before moving to the requirements of Rule 23(a) and 23(b)(3)"); *see also Hayes*, 725 F.3d at 359 (declining to "reach the question of whether [the plaintiff] could satisfy Rule 23(b)(3) predominance" after court found he failed to satisfy ascertainability).

*Peroxide Antitrust Litig.,* 552 F.3d at 311–12. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d at 190 (citations omitted).

Defendant argues Plaintiff's class cannot be certified because the individual question of whether the faxes at issue were received on a stand-alone fax machine or by way of an online fax service predominates over questions common to the proposed class. This Court agrees. As set forth above, a core component of liability under § 227(b)(1)(C) of the TCPA is the sending of an unsolicited advertisement "to a telephone facsimile machine." Indeed, Plaintiff does not dispute his burden to meet this element of his claim. Plaintiff and his expert have conceded that there is no class wide evidence showing the type of equipment on which each proposed class member received the faxes at issue. As such, determining the type of equipment on which each proposed plaintiff received the faxes at issue requires an individualized inquiry on an essential element. Accordingly, Plaintiff has not met his burden as to the predominance requirement.

**CONCLUSION**

For the reasons set forth, this Court finds that Plaintiff has failed to satisfy both the ascertainability and predominance requirements because determining the type of equipment on which each proposed plaintiff received the faxes at issue constitutes an individualized inquiry that cannot be determined by class wide discovery. As such, this Court finds that certification of Plaintiff's proposed class is improper. Accordingly, Plaintiff's motion for class certification is denied. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.